# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF NORFOLK, OCTOBER TERM 1855, AT DEDHAM.

PRESENT:

Hon. LEMUEL SHAW, Chief Justice.
Hon. THERON METCALF,
Hon. GEORGE T. BIGELOW,
Hon. BENJAMIN F. THOMAS, } Justices.
Hon. PLINY MERRICK,

---

## WILLIAM H. ELA vs. JEROME V. C. SMITH & others.

The determination of the mayor of a city, that a riot or mob is threatened, is conclusive that the exigency existed, required by *St.* 1840, *c.* 92, § 27, to authorize him to call out the volunteer militia to aid the civil authority in enforcing the laws.

The volunteer militia, when called out by the mayor of a city under *St.* 1840, *c.* 92, § 27, on the ground that a riot or mob is threatened, may, before such riot or mob has actually taken place, be ordered by the mayor to repair to a particular place, and there perform any specific duty, such as clearing the streets, which in his judgment is necessary to prevent the threatened mob or riot.

Officers of militia, called out by a civil magistrate under *St.* 1840, *c.* 92, § 27, to aid the civil authority in enforcing the laws, cannot be entrusted with discretionary power as to the measures to be adopted; but can only direct the details of the mode of executing specific orders received from the civil magistrate.

Ela *v.* Smith & others.

The power to call out the militia to prevent a threatened riot is not affected by the antici pated cause of the riot being the enforcement of an unconstitutional law.

Civil magistrates and military officers, giving unlawful orders to militia called out to aid the civil authority in enforcing the laws, are liable for acts done by the militia within the fair scope of the orders, but not for acts unauthorized by them.

A marshal of the United States does not, by requesting the mayor of a city to call out the state militia to prevent a riot anticipated in opposition to the service of a civil process of the United States, intended by the marshal to be executed and afterwards executed by him without aid from the military force, and giving assurances that the expenses of calling out the militia will be paid by the United States, render himself responsible for acts done by the militia, when duly called out, under unlawful orders from the mayor or their own officers, during the service of such process.

ACTION OF TORT against Jerome V. C. Smith, mayor of Boston, Benjamin F. Edmands, major general of the first division of the Massachusetts volunteer militia, Thomas H. Evans, commander of a company in said division, and Watson Freeman, marshal of the United States for the district of Massachusetts, for an assault, battery and false imprisonment of the plaintiff at Boston on Friday, the 2d of June 1854.

The defendants answered severally, each denying any part in any assault on the plaintiff; Smith also alleging that, apprehending a riot, he issued a precept and gave orders to Edmands to aid the police in keeping the peace of the city; Edmands that he acted under such precept and orders; Evans that he acted under orders of Edmands; and Freeman that he acted as marshal, in removing a fugitive from service to the State whence he fled, under the act of congress of 1850, *c.* 60, § 9.    9 U. S. Sts. at Large, 465.

At the trial in this court, at February term 1855, before *Merrick, J.*, the evidence introduced by the plaintiff tended to prove the following facts:

On the 24th of May 1854, Anthony Burns was arrested in Boston by the United States marshal, at the claim of Thomas Suttle, as a person held to service or labor under the laws of Virginia, and brought before Edward G. Loring, a commissioner of the circuit court of the United States, and was afterwards confined by the marshal, with the assistance of a body of United States troops, in the court house in Boston, and brought before the commissioner from time to time, until the 2d of June, when

the commissioner decided that he should be delivered to the claimant, and made a certificate under the act of congress of 1850, *c.* 60, § 10, reciting that Suttle had exhibited to him a record of a court of the State of Virginia, of the slavery and escape of Burns, and had proved the identity of Burns, and declaring that the claimant was authorized to remove him to Virginia.

While Burns was in custody, the mayor issued the following orders to General Edmands :

" Commonwealth of Massachusetts. Suffolk, ss. Boston, May 27, 1854. To Major General Benjamin F. Edmands, commanding the first division of Massachusetts volunteer militia.

        " Whereas it is made to appear to me, J. V. C. Smith, [SEAL.] mayor of the city of Boston, that there is threatened a tumult, riot and mob of a body of men, acting together by force, with intent to offer violence to persons and property, and by force and violence to break and resist the laws of this commonwealth in the said county of Suffolk, and that *military force* is necessary to aid the civil authorities in suppressing the same, Now therefore I command you that you cause two companies of your command, armed and equipped, and with proper ammunition, as the laws direct, and with the necessary officers attached, to parade at their respective armories, at ten o'clock A. M., then and there to obey such orders as shall be given them, according to law. Hereof fail not at your peril; and have you then and there this warrant, with your doings returned thereon. Witness my hand, and seal of the city of Boston, this 27th day of May A. D. 1854.

        " J. V. C. Smith, Mayor of the City of Boston."

" City Hall, May 31, 1854. General Edmands : After a careful examination of the condition of the city this morning, I feel justified in saying, that one military company will be amply sufficient, from this date till further orders, to maintain order and suppress any riotous proceedings — acting in concert with the police. At nine o'clock this morning, therefore, you will please discharge one of the two companies on duty, under your command. Very respectfully, &c.,

        " J. V. C. Smith, Mayor."

On the 31st of May, the United States marshal and district attorney called on the mayor, and expressed an opinion that the military force then on duty was inadequate to the maintenance of the peace of the city, at the same time declaring that the United States government did not wish or ask any assistance from the city to execute the laws, and sent him the letters which are copied in the margin.* The mayor and major general afterwards had other interviews with the marshal.

---

* Boston, May 30, 1854. To the Hon. J. V. C. Smith, Mayor of the City of Boston: Sir,

From the indications of an armed resistance to the laws, and the assurances of the military officers on duty, it is manifest that the force now under the orders of Major General Edmands is not sufficient to preserve the peace of the city. The marshal has at his disposal, by order of the President of the United States, all the United States troops, as an armed posse comitatus, which can at present be drawn to this point. He does not ask any aid to execute the fugitive law as such. Nothing is required but the preservation of the peace of the city, and the suppression of organized rebellion.

To effect this, we respectfully submit an opinion, that, if bloodshed is to be prevented in the public streets, there must be such a demonstration of a military force as will overawe attack, and avoid an inevitable conflict between the armed posse of the marshal and the rioters, and earnestly request you, under the views which Major General Edmands has communicated, or will communicate to you, if desired, that you will exercise the powers the law has confided to you, to place under his command such a body of the volunteer militia as will ensure the peace of the city without a conflict.

From the opinion of the military gentlemen with whom we have conferred, and the indications from all other sources of information within our reach, we beg leave to express the opinion, that the entire command of General Edmands within the city will be requisite. We have no express authority to pledge the general government to that effect, but we believe that the expenses incurred by the necessity of such a military force will be met by the President.

Respectfully your obedient servant, WATSON FREEMAN, U. S. Marshal.
Approved. B. F. HALLETT, U. S. Attorney.

---

Office of the U. S. Marshal and Office of the U. S. Attorney. Boston, May 31, 1854. Hon. J. V. C. Smith, Mayor of the City of Boston: Sir,

In reply to your note of this morning, we are authorized by the President of the United States to state that any expense incurred for the city military or otherwise, deemed necessary by the United States attorney and United States marshal to enforce the laws, will be paid by the United States.

On the 31st of May also, the mayor issued to General Edmands a precept, similar in form to that of the 27th of May, and containing the following command : " That you cause the first brigade, and the divisionary corps of cadets, to be detailed from your command, and armed and equipped, and with proper

We deem it necessary, that when the decision of the commissioner is to be given, which will probably be to-morrow morning, the avenues and streets around the court house should be cleared of the crowd, and an ample military force be on guard to preserve the peace of the city, and prevent riot or personal outrages, which are then to be anticipated, whatever may be the decision.

And we further deem it necessary, that if the marshal with his posse is required to pass through the streets of the city, they should not be crowded upon, molested or placed in a position of defence which may render it necessary to protect themselves by a resort to arms. And this requires the whole military and police force of the city to preserve the peace of the city, and prevent riot and assaults upon the officers of the law in the discharge of their duty.

We repeat what we have before said, that the United States officers do not desire you to execute the process under the fugitive law of the United States, which devolves on them alone in the discharge of their duties, but they call upon you, as the conservator of the peace of the city, to prevent the necessity of conflict between the posse of the marshal and those who may attempt to resist them by force, while in the lawful discharge of the duties required of them, whatever those duties may be. Herewith is a copy of the authority derived from the President of the United States. Your obedient servants,

B. F. Hallett, U. S. Attorney.
Watson Freeman, U. S. Marshal.

Washington, May 31, 1854. To B. F. Hallett, U. S. Attorney.

Incur any expense deemed necessary by the marshal and yourself for city military, or otherwise, to ensure the execution of the law. Franklin Pierce.

To the Mayor of the City of Boston, May 31, 1854.

The United States marshal requests that two companies of light infantry be on guard for the night, and until further orders.

Watson Freeman, U. S. Marshal.
Approved. B. F. Hallett, U. S. Attorney.

The opinion of the court will be given at nine o'clock Friday morning, and it is deemed that the request from the marshal and United States attorney, dated this day, for the whole military and police force of the city to preserve the peace of the city, take effect for Friday morning. W. Freeman, U. S. Marshal.

Approved. B. F. Hallett, U S. Attorney.

11 *

ammunition, as the law directs, and with the necessary officers attached thereto, to parade on Boston Common, on Friday, the 2d day of June next, at nine o'clock A. M., then and there to obey such orders as may be given to you." And General Edmands, on the 1st of June, issued an order accordingly, pursuant to which the troops assembled on the common at the time specified.

On the 2d of June, the mayor, (as he stated in answer to the plaintiff's written interrogatories,) gave such directions, verbal and written, as he thought would best tend to preserve the peace of the city; and, (having previously agreed with Edmands that, on receiving notice from the mayor of the hour at which the marshal would move his posse, he should dispose his troops so as to aid the police in keeping the peace of the city,) sent Edmands the following note: " City Hall, June 2, 1854. General Edmands, Sir: The United States marshal informs me, officially, that he shall be ready to move escort at precisely half past twelve o'clock, and you will therefore govern yourself accordingly. Please inform him when all is in readiness. Very respectfully yours,

The boat is at T Wharf. J. V. C. Smith, Mayor."

Early in the same day, the mayor issued and caused to be posted in the vicinity of the court house, and sent Edmands a copy of, the following proclamation:

" Proclamation. To the citizens of Boston. To secure order throughout the city this day, Major General Edmands and the chief of police will make such disposition of the respective forces under their commands as will best promote that important object; and they are clothed with full discretionary powers to sustain the laws of the land. All well disposed citizens, and other persons, are urgently requested to leave those streets which it may be found necessary to clear temporarily, and, under no circumstance, to obstruct or molest any officer, civil or military, in the lawful discharge of his duty. J. V. C. Smith, Mayor. Mayor's Office, City Hall, Boston, June 2d 1854."

General Edmands, after receiving the mayor's note and proclamation, read the latter to his troops, and then, about ten o'clock, marched them from the common to Court Square, and afterwards

so disposed them, in conjunction with the city police, as to exclude the public from Court and State Streets, and allow a free passage for the marshal and his posse from the court house through those streets to Long Wharf, and placed lines of sentries at the ends of the streets leading into Court and State Streets. The police were posted beyond these sentries, some distance down the cross streets, with orders to every captain of police to use every possible means to keep the line, but if he found he could not, to give notice to the police to take care of their own lives, for the military had orders to fire on the people without notice. About two o'clock, Edmands, at the request of Freeman, called at his office, and on being asked the reason of the delay in his receiving notice that the streets were in readiness, referred him to the mayor, and told him that the police had not completed their arrangements ; and immediately called on the mayor to inform him of the delay, and to report that he had posted detachments of troops in support of all the positions taken by the police, but that some important points had been left unguarded ; and was then verbally directed by the mayor to supply the deficiencies at those points by lines of sentries, and to notify the marshal, as soon as he had done so. The troops remained at their posts until about three o'clock, when the marshal and his posse, carrying Burns with them, passed through Court and State and Commercial Streets, and then down Commerce Street along the north side of Long Wharf, and placed Burns on a steamboat lying at T Wharf, which took him out to the United States revenue cutter, to be taken back to Virginia ; and the troops were soon afterwards dismissed.

Captain Evans and his company, with muskets loaded with ball, were posted in Commercial Street, where it joins Commerce Street, and were charged with the duty of keeping Commercial Street clear, and of guarding the passages down Commerce Street and the rear of the procession.

The plaintiff, after Burns had been taken down Long Wharf, attempted to pass along Commercial Street, but was pushed back and knocked down by the soldiers, and cut over the head by a commissioned officer, and then taken away by the police,

the officer, whom some of the witnesses thought to be Evans, following behind with sword drawn. He was detained by the police some hours, and then released.

The plaintiff offered to show that Evans, about the time of the assault on the plaintiff, at the same place, ordered his company to make ready to fire. But this evidence was objected to, and excluded.

The marshal, in answering the written interrogatories of the plaintiff, made the following statement: " I made no proclamation and no written orders, and I called upon no one to aid me, except my posse comitatus, in executing the fugitive slave law. I should have done this without any aid, had not a mob been incited to resist the laws by acts of violence. To prevent a conflict in the streets between the mob and my own posse comitatus, which must have ensued had the mob attempted a rescue, I informed the city authorities when I should proceed through the streets to execute my process, and desired them to protect their own streets against riot and conflict. To ensure order, and prevent the great crowd which was accumulating from blocking up the streets, and to avert a conflict which in that event must have ensued, a programme was drawn up by military gentlemen, which I deemed judicious and proper, and of which I annex a copy." *

---

\* I.   The escort will consist of the marshal's *posse comitatus.*

II.   The line of march, and the avenues leading thereto, to be cleared of citizens, and the military and police guards of the city posted, before the escort moves.

III.   The police guards to be posted across the side streets at those intersections of the avenues leading thereto, which are nearest State Street, and the military guards between the several police parties and State Street.

IV.   One company of cavalry to be posted immediately below the Old State House, to support the clearing of streets, if necessary; then to move from square to square as the escort moves down, preserving the same interval in advance of the escort. A patrol to be kept in front, observing the several cross streets; and, on their reports, detachments to be rapidly advanced to any point of danger.

V.   The escort to move in the following order, viz:

1st. Major Ridgely's artillery battalion, in posts.

2d. One platoon marines.

Ela *v.* Smith & others.

The mayor paid a certain amount of expenses for the city, and they were afterwards refunded by the United States.

At the close of the plaintiff's case, the counsel for the mayor and the two officers moved for a nonsuit, and the counsel for the marshal moved the judge to instruct the jury that the plaintiff was not entitled to recover. But the judge, without hearing the plaintiff's counsel on the motions, and against his protest, reported the evidence in order that the questions of law arising thereon might be considered by the whole court.

*C. M. Ellis,* for the plaintiff. If the defendants, by actual participation, or by authority, aid, request, dictation, procurement, advice or assistance, coöperated in or concerted unlawful acts, or lawful acts by unlawful means, whereby a trespass was done to the plaintiff, they are liable. *Cole* v. *Fisher,* 11 Mass. 137. *Moody* v. *Ward,* 13 Mass. 299. *Ilsley* v. *Nichols,* 12 Pick. 270. *Vosburgh* v. *Moak,* 1 Cush. 453. *Michael* v. *Alestree,* 2 Lev. 172. *Lumley* v. *Gye,* 2 El. & Bl. 252. 2 Greenl. Ev. §§ 621, 622, 629. 3 Greenl. Ev. §§ 40, 44, 50. Story on Agency, §§ 319–321. Lamb. Eiren. 213. Such concert and coöperation are shown by the evidence of the plans, interviews and correspondence of the defendants, and of the payment of all the expenses by the President of the United States.

---

3d. The marshal's civil posse guarding the fugitive.

4th. Two platoons of marines.

5th. Lieutenant Couch's field piece.

6th. One platoon of marines to bring up the rear of the escort and form a guard to the field piece.

VI. A company of cavalry to be drawn up across Court Street, and move towards the Old State House as soon as the escort shall have passed that building, and take its position as a reserve to the whole force, first at the State House, and next in rear of the infantry moving down State Street, ready to act as emergencies may require.

VII. The military and police detachments to move from the side avenues into State Street, as soon as the escort shall have passed the second side street below them, respectively, and gradually move down State Street, so as to be within supporting distance should the escort be attacked. These detachments will march by a flank on the sidewalks so as to leave the street open to the advance of the cavalry, when necessary.                    June 2d 1854.

When unlawful orders, either civil or military, are given, the person giving them, and all acting under them, are liable to any person injured by such acts; and no man can shelter himself under the unlawful order of his superior. *Commonwealth* v. *Blodgett*, 12 Met. 91. *Stetson* v. *Packer*, 7 Cush. 562. *Fisher* v. *McGirr*, 1 Gray, 1. *Oystead* v. *Shed*, 12 Mass. 511. *Little* v. *Barreme*, 2 Cranch, 179. *Mitchell* v. *Harmony*, 13 How. 137. *Greene* v. *Briggs*, 1 Curt. C. C. 333. *Despan* v. *Olney*, 1 Curt. C. C. 306. *Frye's case*, 1 McArthur on Courts Martial, 229, 344. *Mostyn* v. *Fabrigas*, Cowp. 161. *Wall* v. *M'Namara*, cited in 1 T. R. 536. *Wall's case*, 28 Howell's State Trials, 51. *Porteous's case*, 17 State Trials, 923. *Warden* v. *Bailey*, 4 Taunt. 67 *Aaron* v. *Alexander*, 3 Camp. 35. *Coats* v. *Darby*, 2 Comst. 517. *Elder* v. *Morrison*, 10 Wend. 137. Bac. Max. 14. And this liability extends to all injuries which are the natural result of the orders given. Foster, 370. *Derby* v. *Philadelphia & Reading Railroad*, 14 How. 468. 1 Cush. and 2 Lev. above cited.

The powers of calling out the militia, being conferred by statute, and in derogation of the common law and of the rights of the citizens, are to be construed strictly. It is not pretended in this case that a riot actually existed; it is essential therefore 1 the right of the mayor to call out the militia that a riot is actually "threatened, and the fact made to appear to" him. Mere anticipation or possibility of a riot is not sufficient. *St.* 1840, *c.* 92, § 27. *Rex* v. *Pinney*, 5 Car. & P. 270, 277. *Rex* v. *Kennett*, 5 Car. & P. 281 *note*.

The opinion of the mayor that a riot was threatened, is not conclusive. Although the judgments of a court of general jurisdiction cannot be reëxamined collaterally, those of a court of a special and inferior jurisdiction, and *a fortiori* of a mere executive officer, may, unless the facts necessary to give jurisdiction be affirmatively proved. It is no defence that he acted on his best judgment. *Rex* v. *Pinney*, 5 Car. & P. 277. *Weaver* v. *Ward*, Hob. 134. *Underwood* v. *Hewson*, 1 Stra. 596.

Even when a riot is threatened, the mayor's duty is only to keep the peace of the city, and " to suppress violence;" and he has no authority to do any thing not necessary for that pur-

pose. The order to clear the streets, in anticipation of a riot, was unlawful. Rev. Sts. *c.* 129, § 5. *St.* 1840, *c.* 92, § 27. Judge Hoar's Charge, 16 ; 17 Law Reporter, 173. The right of the master to his slave, under the Constitution of the United States, is not paramount to the rights of all other persons to use the public highways for their lawful business, or for any purpose not prohibited by law, even to look on, if they please. Besides, every citizen has the right to the protection of his fellowcitizens against wrong, and, if held under a void warrant, may be rescued. *The Queen* v. *Tooley,* 2 Ld. Raym. 1296. Lamb. Eiren. 183.

The mayor cannot lawfully delegate his power ; nor give discretionary power to the officers of the militia. The troops are to do nothing but appear at the time and place appointed, armed and equipped, and with ammunition, as for inspection ; and there receive specific orders directly from him. *St.* 1840, *c.* 92, § 29. Rev. Sts. *c.* 129, § 5. Judge Hoar's Charge, 17 ; 17 Law Reporter, 173. Declaration of Rights, art. 17. The militia are even prohibited to load with ball, or to have firearms so loaded, at parade, without order of a superior officer. Rev. Sts. *c.* 12, §§ 83, 100. Yet this mayor, as he declares in his proclamation, undertook to clothe the major general and the chief of police " with full discretionary powers," and even instructed them, if they should think necessary, to fire on the people without notice.

The certificate of the commissioner cannot justify Freeman, being issued under the act of congress of 1850, *c.* 60, § 10, upon mere production of a record made in another state in the absence of the alleged fugitive, and proof of his identity. Section 9, which authorizes the marshal, upon the claimant's affidavit that a rescue is apprehended, to transport the fugitive to the State whence he fled, and there deliver him to the claimant, refers only to the certificate mentioned in § 6, which is issued after a hearing and after satisfactory proof of the claimant's whole case; and is not to be extended by construction to a certificate founded only on the unprecedented mode of proof allowed by § 10. 9 U. S. Sts. at Large, 463, 465. By Conkling, J., *Ex parte Davis,* 14 Law Reporter, 309, 310. *Hill* v. *Low,* 4 Wash. C. C

329.   Vin. Ab. Statutes, E, 6.   Smith on Sts. and Const. Law §§ 615, 621, 645, 655, 839.   1 Kent Com. (6th ed.) 464.   2 Inst. 200, 454.   *United States* v. *Coombs*, 12 Pet. 72.   *Fisher* v. *McGirr*, 1 Gray, 39.   *Commonwealth* v. *Aves*, 18 Pick. 223.

Another reason why Freeman cannot justify under this certificate is, that the parts of the fugitive slave act which provide for final certificates are unconstitutional and void, because they make *ex parte* affidavits and records conclusive on courts, and authorize such certificates under § 10 to be issued without notice, and declare that those issued under § 6 shall defeat all process.   Const. U. S. art. 1, §§ 8, 9; art. 3, § 1; amendments, arts. 4, 5, 9.   *Ex parte Bollman*, 4 Cranch, 94.   *Ex parte Booth*, 3 Wisc. 1.   They remand the alleged fugitive, without a trial of the question of his *status*, from a state where he is legally free, to a state where the law will hold him a slave.   *Strader* v. *Graham*, 10 How. 82.   There are no decisions in favor of the validity of these parts of the act.   All the cases, in which the act has been held constitutional, concerned the proceedings prior to the issuing of the final certificate.   Such was *Sims's case*, 7 Cush. 285.

The questions, whether the defendants did coöperate; how they acted; what acts they did or directed; whether they or either of them abused or exceeded their authority; and whether they acted under color of office, with all other questions of fact, are for the jury.   1 Stark. Ev. (4th Amer. ed.) 417.

*R. Choate & G. S. Hillard*, for Smith, Edmands and Evans. If these defendants had acted in aid of the laws of the United States, it would have been legal.   But the evidence shows that they did not, but only acted, in good faith, in keeping the peace of the city.

It appeared to the mayor, acting in the same capacity as a judge of a court of record might, under *St.* 1840, *c.* 92, § 87, that a riot was threatened.   His judgment in the matter is judicial or *quasi* judicial; and his certificate of the fact, made in good faith, is conclusive, and protects him, and all acting under him.   *Chase* v. *Blackstone Canal*, 10 Pick. 244.   *Gray* v. *Bridge*, 11 Pick. 189.   *Morse, petitioner*, 18 Pick. 443.   *United States* v *Guthrie*, 17 How. 304.   *Kendall* v. *United States*, 12 Pet. 610.

*Decatur* v. *Paulding*, 14 Pet. 517. Evidence that a riot was then apprehended might not now be attainable; and an *ex post facto* judgment on the question would not be safe.

The. militia, when lawfully called out, are not governed by the provisions of the riot act, until a riot actually occurs; but the numbers and kind of troops, and the manner in which they shall be employed and posted, to sustain the laws and prevent a breach of the peace, are within the mayor's discretion. Rev. Sts. c. 129, §§ 1–5. *St.* 1840, c. 90, §§ 27–29. And the clearing of the streets was a judicious exercise of this discretion. It is one of the cases where individual convenience must yield to the safety of the whole people.

The militia, acting under the mayor's order, are protected by his precept, just as a civil officer is in the execution of his warrant. *Burdett* v. *Colman*, 14 East, 189. *Burdett* v. *Abbott*, 4 Taunt. 449. *Redford* v. *Birley*, 3 Stark. R. 92.

The officers of the militia must necessarily be entrusted with discretion to act as the exigency may require. Here they were only employed in carrying out the details of a general plan previously agreed upon between the mayor and the major general. They were thus " in exact subordination to the civil authority," as required by the Declaration of Rights, art. 17.

The militia were ordered to appear " armed, equipped, and with ammunition as the law directs." *St.* 1840, c. 90, § 27. This required them to bring ball cartridges with them. Rev. Sts. c. 12, §§ 36, 37, 83, 99. The object of the statute, in any view, requires them to have ball cartridges with them, if the crisis arrives which calls for a firing with ball. The fact that they loaded without authority cannot make the whole assembly unlawful.

The evidence does not show that any of the defendants were present at the assault on the plaintiff; or that it was in any way the result of their acts so as to make them responsible for the injury. *Redford* v. *Birley*, 3 Stark. R. 97. *Timothy* v. *Simpson*, 6 Car. & P. 499. *Sedley* v. *Sutherland*, 3 Esp. R. 202. *The Eleanor*, 2 Wheat. 345. *Moody* v. *Ward*, 13 Mass. 299. *Philadelphia, Germantown & Morristown Railroad* v. *Wilt*, 4 Whart. 143. Ham. N. P. 80, 83. 3 Greenl. Ev. § 40. 2 Hawk. c. 29, §§ 8, 9.

*B. F. Hallett,* for Freeman. All the acts of the marshal were in the exercise of his official duty in serving a process under the fugitive slave law, the constitutionality of which is settled by repeated adjudications. *Prigg* v. *Pennsylvania,* 16 Pet. 539. *Jones* v. *Van Zandt,* 2 McLean, 596, and 5 How. 215. Judge Nelson's Charge, 1 Blatchf. C. C. 636. *Sims's case,* 7 Cush. 285. The marshal being thus in discharge of his duty, all per sons obstructing, resisting or opposing him, directly or indirectly, were guilty of a criminal offence. *United States* v. *Lukins,* 3 Wash. C. C. 335. Judge Curtis's Charge, 17 Law Reporter, 212. The marshal was justified in using all force which he judged necessary to the execution of his process. Archb. Crim. Pl. (5th Amer. ed.) 427.

The marshal had no legal authority or responsibility for the clearing of the streets by the mayor, and is not shown to have had any connection with the assault on the plaintiff.

*J. P. Hale* (of New Hampshire) replied.

The decision was made at February term 1857.

BIGELOW, J. This case presents for the first time to the consideration of the court questions of great interest and importance, arising on the true construction and practical operation of those provisions of the statutes, by which authority is given to certain civil officers to call out the organized militia of the Commonwealth to aid in preserving the public peace and enforcing the laws. It is obvious that the nature of the case necessarily leads to an inquiry into the powers and duties of magistrates in the exercise of some of their highest functions, and to a determination of the rights and obligations of citizens, when put to the severest test to which they can be subjected in a well ordered and law-abiding community. It was therefore a wise act of judicial discretion in the judge who presided at the trial to withdraw the case from the consideration of the jury, in order that the legal principles applicable to the facts proved might be first deliberately settled and adjudicated. By such a course, the rights of all parties were preserved, and, in the event of another trial, an intelligent, safe and impartial verdict rendered more certain.

The provisions of law, on which the defendants Smith, Edmands and Evans rely for a justification of the acts of trespass alleged in the plaintiff's writ, are found in *St.* 1840, *c.* 92, establishing the volunteer militia, §§ 27–29. These are reënactments of the Rev. Sts. *c.* 12, §§ 134–136, with the addition of mayors of cities to the list of civil officers by whom an armed force may be called out; and are intended to prescribe the same mode of calling out the "volunteer militia" in aid of the civil authority, as was provided in the Rev. Sts. for calling out, in like case, a portion of the entire organized militia of the State. The aspect in which this case is presented renders it unnecessary to consider in detail the provisions of the Rev. Sts. *c.* 129, § 5, which are applicable only where a tumult or riot actually exists, and a military force, having been duly called out, is employed in suppressing or dispersing it. Such was not the case here. The defendants justify on the ground, and the evidence tends to prove, that an unlawful assembly or mob was threatened, and that it was in view of the imminent danger to the public peace, and an anticipated violence and resistance to the laws, that the acts charged in the declaration were committed. It is to the rights, powers and duties of the defendants, acting in their official capacities in such an exigency, that the whole inquiry in the present case is to be limited.

By the sections of *St.* 1840, *c.* 92, above cited, it is provided, among other things, that the mayor of a city, or any other of the civil officers therein designated, may, in case a "tumult, riot or mob shall be threatened, and the fact be made to appear to" him, issue his precept, the form of which is prescribed by § 27, to call out a division or any smaller body of the volunteer militia "to aid the civil authority in suppressing such violence, and supporting the laws." In exercising the authority thus conferred, the statute makes it the first duty of the mayor or other magistrate to determine whether the occasion for calling out a military force exists. This depends on a question of fact, which it is his exclusive duty to determine. If it be made to appear to him that a tumult or riot is threatened, he may then issue his precept. He is, in his official capacity, and under the sanction

of his oath of office, to examine and decide this question. This provision of the statute clearly confers a judicial power. Whenever the law vests in an officer or magistrate a right of judgment, and gives him a discretion to determine the facts on which such judgment is to be based, he necessarily exercises, within the limits of his jurisdiction, a judicial authority. So long as he acts within the fair scope of this authority, he is clothed with all the rights and immunities which appertain to judicial tribunals in the discharge of their appropriate functions. Of these none is better settled than the wise and salutary rule of law by which all magistrates and officers, even when exercising a special and limited jurisdiction, are exempted from liability for their judgments, o. acts done in pursuance of them, if they do not exceed their authority ; although the conclusions to which they arrive are false and erroneous. The grounds of their judgment cannot be inquired into, nor can they be held responsible therefor in a civil action. *Piper* v. *Pearson,* 2 Gray, 120. *Clarke* v. *May,* 2 Gray, 410. This protection and immunity are essential in order that the administration of justice and the discharge of important public duties may be impartial, independent and uninfluenced by fear of consequences. And they are the necessary result of the nature of judicial power. It would be most unreasonable and unjust to hold a magistrate liable for the lawful and honest exercise of that judgment and discretion with which the law invested him, and which he was bound to use in the discharge of his official duties. Nor would there be any security or safeguard to the magistrate or other officer against liability, however careful and discreet he might be in exercising his authority, if his judgments were to be examined into and revised in ulterior proceedings against him, in the light of subsequent events, upon new evidence, and with different means of forming conclusions from those upon which he was called upon to act in the performance of his duty. Such an *ex post facto* judgment might be more sound and wise, but it would not be a just or proper standard by which to try the opinions and conduct of an officer, acting at a different time and under other circumstances Especially is this true in a case like the one at bar, where a public

officer is compelled to decide and act promptly in a pressing emergency, and without time or opportunity for careful and deliberate consideration.

If any argument were needed to strengthen this view of the nature of the power conferred by the statute in question, or to show that it is in accordance with the intent of the legislature in creating that authority and jurisdiction, it may be found in the fact that the same power is granted by the statute to a court of record sitting within the county, as is given to the commander in chief and mayors of cities. It is entirely clear that no liability could attach to the judge of a court for exercising his authority and judgment in a matter within his jurisdiction ; and it is equally clear that the same rule must apply to other officers performing the same duty under the same grant of power.

It follows from these considerations, that the question, whether a riot was actually threatened, cannot be inquired into in this action. The judgment of the mayor upon it was conclusive, and having been rightly exercised within the limits of the authority conferred by law, no liability was incurred by him in issuing the precept by which the armed force was called out. Another result also follows as a necessary corollary. The precept of the mayor was in exact conformity to the terms of the statute. It was, therefore, a warrant regular on its face, issued by a magistrate of competent authority, within the scope of his jurisdiction. On familiar principles, it affords a complete justification to all those bound to obey its command, for acts lawfully done by them in pursuance thereof. *Fisher* v. *McGirr*, 1 Gray, 45, 46. *Whipple* v. *Kent*, 2 Gray, 413.

The armed force having been legally called out and assembled at the place designated in the precept of the mayor, for the reason that " a tumult, riot or mob was threatened," the important question arises as to the nature and extent of the authority of the mayor to employ the force for the prevention or suppression of the apprehended violence. A satisfactory answer to this inquiry is furnished by the statute itself, which expressly provides, not only that a military force may be called out when a riot or tumult exists or is threatened, but declares the purpose for

12 *

which it may be thus ordered to appear, to be " to aid the civil authority in suppressing such violence, and supporting the laws." This clearly includes threatened, as well as existing, violence and resistance to the laws. When, therefore, it is provided in § 29 that the troops assembled in pursuance of a precept issued under § 27 " shall obey and execute such orders as they may then and there receive according to law," it is manifestly intended to comprehend all necessary and proper orders issued by the officers designated in the statute to effect the purpose for which the military force is called out. If this purpose be to prevent a riot or other unlawful violence, threatened and not actually existing, then the civil officers have the right to employ the troops in all reasonable and proper means to effect this purpose, and the officers and men composing the armed force are bound to obey their commands. Indeed it would be little else than absurd to say that a body of troops might be summoned to aid in carrying out an object distinctly specified in the statute ; but that, when they appeared in pursuance of such summons, no one could egally give them an order to accomplish the purpose for which they were assembled. The right and power to call them out for a particular purpose carries with it, by necessary and reasonable implication, the authority to employ them to effect that object, and to issue all proper orders and use all reasonable means therefor.

Any other construction of the statute would render its provisions, in case of a threatened riot or tumult, of no practical utility or advantage. If no orders could be legally issued to the troops, after their assembly under the precept of a mayor or other civil officer, until a tumult, or riot, or other violent resistance to the laws actually existed, it is clear that they could not be effectually employed in efforts to prevent or suppress any anticipated outbreak or disturbance of the public peace.

Nor do we think any sound argument against the existence of a right in the civil officers to issue orders and employ an armed force to prevent a threatened tumult or riot can be drawn from the Rev. Sts. *c.* 129, § 5, which provide that, when a riot or tumult actually exists, the military force called out to aid the civil au

thority shall, upon their arrival at the place of such riot or tumult, obey such orders as they may have received from such officers; on the contrary, the language of that statute clearly implies an authority previously vested in such officers to give all needful and proper orders to the troops to suppress the riot. The manifest purpose of that provision was not to confer a power on the officers named in *c.* 12, to issue orders to the military force called out by their authority; but only to give the same power to any two of the other officers enumerated in § 1 of *c.* 129, and by an express enactment to secure ample protection to the troops against any personal liability, while engaged in a difficult and perilous duty.

We have no doubt, therefore, that it was clearly within the authority conferred on the mayor by the statute, to order the troops assembled by his precept on the 2d of June 1854 on Boston Common, to repair thence to any designated portion of the city, there to perform a specific duty or service by him directed, such as clearing the streets from crowds, and preventing the ingress and egress of persons, if, in his judgment, it was expedient and necessary for the purpose of suppressing a tumult or other unlawful violence and resistance to the laws then and there threatened. And this is by no means an extraordinary power. A similar authority, in cases of actual riot or tumult, is vested in all magistrates and civil officers by the well settled rules of the common law. 1 Hawk. *c.* 28, 4, § 11. *Rex* v. *Pinney*, 5 Car. & P. 254, 258, *note. Case of Arms,* Pop. 121.

It cannot be urged, as a valid argument against the recognition of this authority in civil officers, that it is liable to abuse, and may be made the instrument of oppression. The great security against its misuse and perversion is to be found in the discretion, good judgment and honesty of purpose of those to whom important public duties are necessarily entrusted. But the existence of such authority is essential in a community where the first and most important use of law consists in preserving and protecting persons and property from unlawful violence. The same argument would apply with equal, if not greater force, to the authority clearly given to any two or more of the same officers, when a riot actually exists, to take life, if in

their judgment necessary, in which case they are by express enactment to "be held guiltless and fully justified in law." Rev. Sts. *c.* 129, §§ 5, 6.

But while thus recognizing the authority of civil officers to call out and use an armed force to aid in suppressing a riot or tumult actually existing, or preventing one which is threatened, it must be borne in mind that no power is conferred on the troops, when so assembled, to act independently of the civil authority. On the contrary, they are called out, in the words of the statute, "to aid the civil authority," not to usurp its functions, or take its place. They are to act as an armed police only, subject to the absolute and exclusive control and direction of the magistrates and other civil officers designated in the statute, as to the specific duty or service which they are to perform. The statute does not even enlarge the power of the civil officers by giving them any military authority ; but only places at their disposal, in the exercise of their appropriate and legal functions, an organized, disciplined and equipped body of men, capable of more efficient action in an emergency, and among a multitude, than an ordinary police force. Nor can the magistrate delegate his authority to the military force which he summons to his aid, or vest in the military authorities any discretionary power to take any steps or do any act to prevent or suppress a mob or riot. They must perform only such service and render such aid as is required by the civil officers. This is not only essential to guard against the use of excessive force and the exercise of irresponsible power ; but it is required by the fundamental principles of our constitution, which provides that " the military power shall always be held in an exact subordination to the civil authority, and be governed by it." Declaration of Rights, art. 17. It does not follow from this, however that the military force is to be taken wholly out of the control of its proper officers. They are to direct its movements in the execution of the orders given by the civil officers, and to manage the details in which a specific service or duty is to be performed. But the service or duty must be first prescribed and designated by the civil authority.

In the present case, therefore, if the division marched from the common, where it was duly assembled and acting, solely under the proclamation of the mayor bearing date of June 2d 1854, addressed to the citizens of Boston, a copy of which was sent to the major general, in which it is stated that he and the chief of police are " clothed with full discretionary powers to sustain the laws of the land; " and, by virtue of the discretion thus given, proceeded to clear and guard the streets; it acted without any lawful authority, and the defendants Smith, Edmands and Evans are legally responsible to the plaintiff for any act of force or violence committed upon him, in pursuance of their orders, or in which they or either of them participated.

If, however, it shall be made to appear that the act of clearing and guarding the streets was done in pursuance of a specific order from the mayor, either verbal or written, to effect that purpose, it would be a sufficient justification for all the acts of the defendants, which were reasonable and necessary for the performance of this specific duty; and the plaintiff cannot recover, unless he can show that the force used towards him was excessive and unreasonable. Such specific order may be shown by proof that it was arranged between the mayor and the major general, that the service of clearing and guarding the streets was to be performed by the military force on the happening of a certain specified contingency or event, and that intelligence of the occurrence of such contingency or event was communicated to the major general by the mayor, with an order to carry out and perform the specified duty previously designated and prescribed by him.

It was urged by the plaintiff that all the defendants were liable in this action, because the occasion of the alleged threatened riot or tumult was the surrender of a fugitive slave, and that the provision of the act of congress of 1850, *c.* 60, authorizing such surrender, was unconstitutional and void, and the proceedings of the United States commissioner in making the surrender illegal and invalid. But it is entirely clear that this argument can have no legitimate bearing on the legal issues presented in this case. The defendants Smith, Edmands and Evans do not justify

their acts under the proceedings of the United States commissioner, but solely under the provisions of law authorizing a military force to be called out for the prevention of a threatened riot, of which the removal of a fugitive slave was anticipated as the occasion. The only question, therefore, as to them, is, whether they were legally called out, and acted under orders lawfully given by the civil authority. Besides, the right and duty of calling out a military force to repress and prevent an anticipated riot cannot be made to depend, in any degree, upon the cause of such threatened disturbance of the peace. It is equally the duty of the civil officers to take all proper steps to prevent a threatened riot or mob, whether it was likely to arise from the enforcement of a constitutional or unconstitutional law. Under our constitution, where the right is secured to every person " to find a remedy by having recourse to the laws for all injuries or wrongs which he may receive in his person, property or character," a resort to unlawful violence cannot be necessary or justifiable. If a law be unconstitutional, those whose rights are infringed or invaded by it must seek their redress through the appropriate channels in the constituted tribunals of the country. If they have recourse to illegal violence, they break down the very constitution which they claim as their protection ; and in striving to vindicate their own rights, they violate the rights of others.

Upon the evidence offered by the plaintiff at the trial, there are no sufficient grounds to authorize a jury to find a verdict against Freeman. The acts done by him had no other connection with those of the other defendants, by which the plaintiff alleges he was injured, than necessarily arose from the fact, that the performance of his official act as marshal of the United States was the cause or occasion which rendered it necessary, in the judgment of the mayor, to call out a military force to prevent a threatened disturbance of the peace. He did not ask for the aid of any portion of the militia in the service of the process in his hands ; but, on the contrary, informed the mayor that no such aid was required. In advising that they should be called out to prevent a riot, he only asked for a legal exercise of the authority vested in the mayor. His statement that the ex-

penses incurred by calling out the militia would probably be paid by the president, as they afterwards were, was only a voluntary offer to compensate the city for the lawful service of the military force.   He is not shown to have advised or aided in the commission of any unauthorized or unlawful act by which the plaintiff was injured.

It follows, that the question whether the military force was legally and properly called out cannot be drawn into controversy in this case.   That was conclusively settled by the action of the mayor in issuing his precept according to the provisions of the statute, and therefore the only questions as to the remaining defendants, Smith, Edmands and Evans, are, whether specific orders were given by the mayor for clearing and guarding the streets on the 2d of June 1854, and if so, whether any of the defendants acted unreasonably, or exceeded the just limits of the authority vested in them by law.

Of course, the question whether the acts charged in the declaration were the result of the orders given for the suppression of a riot, or were the consequence of a sudden outbreak, in which either of the defendants acted upon his own responsibility, will be open, to be determined upon the familiar principles applicable tc actions of trespass upon the person.   The defendants cannot be held for the unlawful acts of others, done without their authority, and not coming within the fair scope of the orders given by them.   The defendants Smith and Edmands will not be liable to the plaintiff for any force and violence used upon him, beyond that which was necessary to carry into effect the order for clearing and guarding the streets, even if such order was not legally given, according to the rules and principles above stated.   Not having been present at the alleged assault, they cannot be held liable for any unauthorized violence of their soldiers.   The same rule would apply to Evans, if he did not authorize or participate in the alleged violence offered to the plaintiff.                              *Case to stand for trial.*

A trial was had at February term 1858, before *Merrick*, J., and resulted in a verdict for the defendants.