## COMMONWEALTH *vs.* BOB ABRAMMS.

No. 04-P-1211.

Hampshire. August 5, 2005. - June 23, 2006.

Present: GELINAS, BROWN, & BERRY, JJ.

*Constitutional Law,* Right to assemble. *Practice, Criminal,* Instructions to jury. *Due Process of Law,* Elements of criminal offense. *Statute,* Construction.

Discussion of constitutional principles applicable in analyzing a statute challenged on its face on grounds of overbreadth or vagueness. [579-582]
This court concluded that G. L. c. 269, § 2, which penalizes "unlawful assembly," was not unconstitutionally vague or overbroad, where the statute only punished those gathered with a common intent to accomplish a common cause through force or violence. [582-586] BROWN, J., concurring. BERRY, J., dissenting.

COMPLAINT received and sworn to in the Northampton Division of the District Court Department on April 1, 2003.

The case was tried before *W. Michael Goggins,* J.

*Harry L. Miles* for the defendant.

*Steven Greenbaum,* Assistant District Attorney, for the Commonwealth.

GELINAS, J. After a jury trial in the Northampton Division of the District Court Department, the defendant was convicted under G. L. c. 269, § 2, of failing to obey the order of a police officer to disperse from an "unlawful assembly." On appeal, the defendant argues that the phrase "riotously or tumultuously assembled," set forth in the statute, should be read conjunctively with the term "unlawful assembly" to define the offense, and that when the judge omitted this phrase from his instructions, the jury were precluded from considering an essential element of the offense. In addition, the defendant contends that the statute is unconstitutional on its face, claiming that it is vague

and overbroad. He also argues that the judge erred in failing to give an instruction that, under the First Amendment to the United States Constitution and arts. 16 and 19 of the Massachusetts Declaration of Rights, the people have the right to assemble to engage in constitutionally protected speech and petition the government.

The trial transcript has not been made part of the record on appeal.[1] Without a complete record we will not reach either the question whether the statute was unconstitutional as applied, or claimed errors in the judge's instructions to the jury. We consider only the defendant's claim that the statute is unconstitutional on its face and the question whether the phrase "riotously or tumultuously assembled" should be read conjunctively to describe the offense of unlawful assembly.

Although, in the absence of a transcript, we have no information as to what actually transpired, we discern from other materials included in the appellate record that what occurred, generally, was as follows. The defendant, along with other persons, participated in an assembly in Northampton to protest the involvement of the United States in the Iraq war. At least some persons involved in the protest may have been on a sidewalk. The defendant was subsequently arrested for refusing to disperse upon the command of a police officer.[2]

*Defendant's arguments on interpretation of statute.* The defendant argues that on its face the statute is unconstitutionally overbroad and vague unless the offense of unlawful assembly is qualified by the additional statutory terms "riotous or tumultuous."

The offense of refusing or failing to obey an order to disperse from an unlawful assembly is set forth in two sections of G. L. c. 269. The conduct at which the statute is directed is set out in G. L. c. 269, § 1, as amended through St. 1991, c. 412, § 98,[3] the relevant portion of which reads as follows:

---

[1]Although the defendant did not include a transcript of the trial proceedings on appeal, he included copies of jury instructions, which he and the Commonwealth agreed at oral argument were the instructions given at trial.

[2]The defendant was found not guilty of two other charges, namely, disturbing the peace, G. L. c. 272, § 53, and obstructing a public passageway or sidewalk in violation of a municipal ordinance.

[3]See now G. L. c. 269, § 1, as amended through St. 2004, c. 348, § 1.

"If five or more persons, being armed with clubs or other dangerous weapons, or if ten or more persons, whether armed or not, are unlawfully, riotously or tumultuously assembled in a city or town, . . . any member of the city, town, or state police . . . shall go among the persons so assembled . . . and . . . command all persons so assembled immediately and peaceably to disperse . . . ."

In the event those ordered to disperse fail to do so, the following portion of G. L. c. 269, § 2, as appearing in St. 1965, c. 647, § 1A, sets forth the authority to arrest and punish:

"Whoever . . . if required by such . . . officer to depart from the place, refuses or neglects so to do, shall be considered one of the rioters or persons unlawfully assembled, and shall be [subject to criminal prosecution and punishment]."

We think the defendant's argument that "unlawful assembly" must be qualified by "riotous or tumultuous" is flawed in two respects. First, his argument is based on decisional law interpreting a related, but separate offense, set out by G. L. c. 269, § 8, which requires a municipality to pay damages caused by a riotous or tumultuous assembly that it had an obligation to control. See *Yalenezian* v. *Boston*, 238 Mass. 538, 542-543 (1921); *Abraham* v. *Woburn*, 383 Mass. 724, 728 (1981). The *Abraham* court, *supra* at 728, quoting from *Yalenezian* v. *Boston*, *supra*, concluded in interpreting G. L. c. 269, § 8, that the phrase "riotously or tumultuously assembled" should be read "conjunctively to describe the offence of an unlawful assembly which has proceeded to execute an unlawful purpose in a way that has resulted in the destruction of property or [in] injury thereto, and in a manner to give firm and courageous persons in the neighborhood of such assembly reasonable grounds to apprehend a breach of peace in consequence of it." Under the statute at issue in *Abraham* and *Yalenezian*, however, damages can only be obtained in the event the property damage is caused by the actions of "persons who are riotously or tumultuously assembled," i.e., who are actually engaged in rioting. The holding, thus, is not necessarily determinative of the offense in question here, where property damage is not involved and the

defendant was not charged with rioting, but rather with failing to obey an order to disperse from an "unlawful assembly."

Second, the defendant improperly assumes that only the crime of riot is encompassed within G. L. c. 269, §§ 1, 2. Although riot is among the offenses included within G. L. c. 269, §§ 1, 2, the statute refers to "rioters *or* persons unlawfully assembled" (emphasis supplied). G. L. c. 269, § 2. The use of the disjunctive "or" in §§ 1 and 2 supports the conclusion that unlawful assembly is a separate offense from that of rioting. See *Commonwealth v. Davie*, 46 Mass. App. Ct. 25, 27 (1998), quoting from *Eastern Mass. St. Ry. v. Massachusetts Bay Transp. Authy.*, 350 Mass. 340, 343 (1966) ("The word 'or' is given a disjunctive meaning unless the context and the main purpose of all the words demand otherwise"). Moreover, as will be discussed more fully below, unlawful assembly historically has been an offense separate from the offense of riot.

*Constitutional claim.* At bottom, the defendant raises a facial challenge to the statute on grounds of overbreadth and vagueness. We will first set out relevant constitutional principles, then examine the meaning of the statutory provision in question, and, finally, consider the constitutionality of the provision in respect to this claim.

a. *Relevant constitutional principles.* A law is overbroad "if it uses means which sweep unnecessarily broadly and thus invades the area of protected freedoms." Smith, Criminal Practice & Procedure § 6, at 10 (2d ed. 1983). See *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973); *Commonwealth v. Orlando*, 371 Mass. 732, 733 (1977). We will consider the facial validity of an offense even though the defendant's conduct[4] "might be of the class properly the subject of State regulation, for '[i]t matters not that the [form of expression] used [by the defendant] might have been constitutionally prohibited under a narrowly and precisely drawn statute.' " *Commonwealth v. A Juvenile*, 368 Mass. 580, 584-585 (1975), quoting from *Gooding v. Wilson*, 405 U.S. 518, 520 (1972). "This exception [to the traditional rule of standing] is based on an overriding interest in

---

[4]Here, because of the defendant's decision not to provide a transcript on appeal, we do not know exactly the conduct in which the defendant engaged.

preventing any 'chill' on the exercise of First Amendment rights." *Commonwealth* v. *Bohmer*, 374 Mass. 368, 373 (1978).

We note, however, that because facial challenges greatly increase the number of persons who have standing to bring a claim, the United States Supreme Court has admonished that the overbreadth doctrine be employed sparingly. *Broadrick* v. *Oklahoma*, 413 U.S. at 610. See *Commonwealth* v. *Provost*, 418 Mass. 416, 422-423 (1994). If a statute's deterrent effect on protected expression is not "both real and substantial" and if the statute is "readily subject to a narrowing construction," the doctrine of overbreadth may not be employed. *Young* v. *American Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976). See *Broadrick* v. *Oklahoma*, 413 U.S. at 613.

The vagueness doctrine, in its primary sense, relates to the requirement, grounded in concepts of due process, that "[a] law is unconstitutionally vague if it is not sufficiently explicit to give clear warning as to proscribed activities." *Commonwealth* v. *Orlando*, 371 Mass. at 734. To satisfy constitutional requirements, laws must be susceptible to ready understanding by "men of common intelligence." *Commonwealth* v. *Gallant*, 373 Mass. 577, 580 (1977), quoting from *Connally* v. *General Constr. Co.*, 269 U.S. 385, 391 (1926). In applying this standard, courts are ever mindful of "the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and [yet] sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Commonwealth* v. *Gallant, supra*, quoting from *Colten* v. *Kentucky*, 407 U.S. 104, 110 (1972). Ultimately, however, "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta* v. *New Jersey*, 306 U.S. 451, 453 (1939). See *Chicago* v. *Morales*, 527 U.S. 41, 57-58 (1999) (what is illegal must be clear or due process is violated; statute must distinguish between innocent conduct and conduct threatening harm).

In addition to fixing minimum standards for providing notice of the conduct proscribed by particular laws, the vagueness doctrine also prohibits such imprecision as might give rise to arbitrary enforcement of laws. Consistent with this principle, legislatures are constitutionally required to set forth minimum

guidelines for the enforcement of criminal statutes to avoid "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their [own] personal predilections." *Commonwealth* v. *Williams*, 395 Mass. 302, 304 (1985), quoting from *Smith* v. *Goguen*, 415 U.S. 566, 575 (1974). See *Commonwealth* v. *Gallant*, 373 Mass. at 580 ("[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries . . ."). It is this aspect of vagueness that is implicated by the defendant's claims here. The gravamen of the defendant's argument with regard to vagueness is that § 2, by authorizing police to issue and enforce a dispersal order in the context of any "unlawful[], riotous[] or tumultuous[]" assembly (c. 269, § 1), confers too much discretion on police and thus potentially impinges on the rights to assemble and freedom of speech.

An additional principle to be noted is that "[w]here a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Commonwealth* v. *Gallant*, 373 Mass. at 580, quoting from *Smith* v. *Goguen*, 415 U.S. at 573. Cf. *Commonwealth* v. *A Juvenile*, 368 Mass. at 584, quoting from *Speiser* v. *Randall*, 357 U.S. 513, 525 (1958) ("any statute which regulates speech requires the strictest of our scrutiny because 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn'").

We note also that in clarifying the meaning of a law, our discretion is limited. For example, we are required to presume that every enactment of the Legislature is intended to comply with constitutional constraints. See *Commonwealth* v. *Welch*, 444 Mass. 80, 99-100 (2005). Whenever possible, therefore, a constitutional construction must be imposed on a challenged statute. See *Commonwealth* v. *Templeman*, 376 Mass. 533, 535-536 (1978). As the Supreme Judicial Court stated in *Commonwealth* v. *Lammi*, 386 Mass. 299, 301 (1982), quoting from *Commonwealth* v. *O'Neil*, 233 Mass. 535, 540-541 (1919), we must "indulge every rational presumption in favor of [a statute's] validity and 'it will not be denounced as contrary to the Constitution unless its language is so clear and explicit as to render impossible any other reasonable construction.' "

Finally, in reviewing the defendant's claim, we take note of two landmark cases involving the right of assembly under the First Amendment to the United States Constitution, *Edwards* v. *South Carolina*, 372 U.S. 229 (1963), and *Cox* v. *Louisiana*, 379 U.S. 536, 549-552 (1965). In *Edwards*, the United States Supreme Court, holding that the right of assembly had been infringed, overturned the convictions under a breach of the peace statute of members of a group of college students who had assembled on public property to protest discrimination against African Americans. Critical to this decision was the Court's conclusion that there had been no obstruction of traffic and no violence or threats of violence. *Id.* at 231-232, 236.

In *Cox* v. *Louisiana*, 379 U.S. at 545-547, a group of protesters had peaceably assembled at a courthouse to protest segregation. Although a sidewalk across the street from the courthouse had been obstructed during part of the assembly, the Supreme Court overturned the defendants' convictions, holding that the gathering was constitutionally protected because local officials had regularly permitted parades and similar meetings even where they had the effect of obstructing traffic, and because there was no evidence of violence or words inciting violence. *Id.* at 550-551, 556-557. Cf. *Commonwealth* v. *A Juvenile*, 368 Mass. at 587-599 (disorderly person offense construed to relate exclusively to activities that do not involve protected exercise of First Amendment right); *Commonwealth* v. *Jarrett*, 359 Mass. 491, 493, 496-498 (1971) (disturbing the peace offense construed to exclude protected expression).

b. *Offense of refusing to disperse from unlawful assembly.* With these principles in mind, we proceed to consider the defendant's claim. Ordinarily, the starting point of our analysis must be the language of the statute. "[T]he words of a statute are the primary source from which we ascertain legislative purpose, and when the text of a statute is clear and unambiguous, we construe the language in accordance with its plain and ordinary meaning." *Commonwealth* v. *Hatch*, 438 Mass. 618, 624 (2003). See *Commonwealth* v. *Ray*, 435 Mass. 249, 252 (2001), and cases cited; *Foss* v. *Commonwealth*, 437 Mass. 584, 586 (2002). Here, the crime in question — refusal to disperse from an unlawful assembly — involves a statute into which the

Legislature incorporated a common-law offense — unlawful assembly — without defining that offense; we are therefore required to look to the common law for the definition of that offense. See *Commonwealth* v. *Webster*, 5 Cush. 295, 303-304 (1850); *Commonwealth* v. *Slaney*, 345 Mass. 135, 138 (1962); *Commonwealth* v. *Jarrett*, 359 Mass. at 493-495. See also *Commonwealth* v. *Brasher*, 359 Mass. 550, 553-554 (1971); *Commonwealth* v. *A Juvenile*, 368 Mass. at 585.

The pertinent Massachusetts statutes, now codified at G. L. c. 269, §§ 1 and 2, were originally enacted in 1750 and 1786, respectively. At early common law, unlawful assembly generally meant a group of persons who assembled for the purpose of rioting, but who, after meeting, did not riot or take any overt act toward carrying out their purpose. See *Regina* v. *Puch*, Holt KB 636, 87 Eng. Rep. 900 (1704); Model Penal Code § 250.1 commentary (1980); Annot., What Constitutes Offense of Unlawful Assembly, 71 A.L.R. 2d 875, § 2 n.2 (1960 & Supp. 1991). Unlawful assembly historically was one of a series of three related offenses against the public peace — unlawful assembly, rout,[5] and riot. See Model Penal Code § 250.1 commentary; *Commonwealth* v. *Gibney*, 2 Allen 150, 152 (1861) ("The distinction in criminal treatises, in the definitions of riots, routs and unlawful assemblies, assumes that there must be an assembling together, and an unlawful assembly . . ."). See also *Commonwealth* v. *Runnels*, 10 Mass. 518, 519 (1813) (not necessary to use phrase "in terrorem populi" in indictment for riot, as that phrase was only necessary "in indictments for that species of riots which consist in going about armed, etc., without committing any act . . . because th[at] offense consists in terrifying the public" [referring to offense of unlawful assembly], whereas if actual riotous acts are committed those words are unnecessary).

Early Massachusetts cases referring to unlawful assembly usually involved indictments for riot and not unlawful assembly per se, but referred to unlawful assembly because it was a necessary component of the crime of riot. See *Commonwealth* v. *Runnels*, *supra* (indictment charging riot alleged that defendants "assembled unlawfully," "with force and arms," and "being so

---

[5]Rout is no longer recognized as a separate crime.

assembled . . . , unlawfully, riotously and routously" rushed into a public hall and disrupted voting); *Commonwealth* v. *Gibney*, *supra* (indictment for riot requires allegation and proof of unlawful assembly); *Commonwealth* v. *Frishman*, 235 Mass. 449 (1920). Since unlawful assembly was a necessary component or element of the crime of riot, those cases contain the definition of unlawful assembly.

For example, in *Commonwealth* v. *Gibney*, 2 Allen 150, 151 (1861), the Supreme Judicial Court observed: "The distinction in criminal treatises, in the definitions of riots, routs and unlawful assemblies, assumes that there must be an assembling together, and an unlawful assembly; although the assembly may not have been unlawful on the first coming together of the parties, but becomes so by their engaging in a common cause, to be accomplished with violence and in a tumultuous manner." In *Commonwealth* v. *Frishman*, *supra*, a case involving a riot, the Supreme Judicial Court stated that the trial judge had "accurately instructed the jury upon the issues of law presented," *id*. at 455, where the judge "in substance instructed the jury that riot could be described generally as a tumultuous disturbance by *a sufficient number of persons . . . assembled with intent to commit or assist in the execution of an unlawful act by force and violence*; that the essential element was that there must be violence and the intent to commit an act of violence; . . . that the purpose might be formed suddenly; *that, although the assembly might not have been unlawful on the first coming together of the parties, it might become so by their engaging in a common cause to be accomplished through force and violence; . . . that mere presence was not enough; that there must be the intent to accomplish unlawfully the purpose by force and violence . . .*" (emphases supplied). *Id*. at 451.

In *Ela* v. *Smith*, 5 Gray 121, 135 (1855), the Supreme Judicial Court indicated that where a gathering is poised to engage in violence, it may be denominated an unlawful assembly: "[T]he evidence tends to prove, that an unlawful assembly or mob was threatened, and that it was in view of the imminent danger to the public peace, *and* an anticipated violence and resistance to the laws, that the acts charged in the declaration were committed" (emphasis supplied). Thus, Massachusetts cases have

consistently read "unlawful assembly" in the context of a gathering, the unlawful character of which derives, at least in part, from its members' common intent to resort to force or violence, shown either by an actual resort to violence or by acts giving probable cause to believe that such violence is imminent. See *Commonwealth* v. *Runnels, supra*; *Ela* v. *Smith, supra*; *Commonwealth* v. *Gibney, supra*; *Commonwealth* v. *Frishman, supra*. See also *Yalenezian* v. *Boston*, 238 Mass. at 543 (1921) ("Persons having lawfully come together and being lawfully together, may, thereupon, become an unlawful assembly and commit a riot, although they had not that purpose when they assembled").

Consistent with this long line of Massachusetts decisions, we conclude that the term "unlawful assembly" should be defined, for the purposes of G. L. c. 269, § 2, as any gathering otherwise meeting the requirements of that provision, the members of which have formed a common intent to "engage[] in a common cause . . . to be accomplished with violence and in a tumultuous manner" (*Commonwealth* v. *Gibney*, 2 Allen at 152) or "through force and violence" (*Commonwealth* v. *Frishman*, 235 Mass. at 352, 355),[6] that is, where there is an "imminent danger . . . [of] violence." *Ela* v. *Smith*, 5 Gray at 135.[7] Thus, an "essential element" of both "riot" and "unlawful assembly" is

---

[6]There must also be the common or shared intent "mutually to assist one another against any person who should oppose them in doing so," *Commonwealth* v. *Gibney, supra* at 152.

[7]Other States have adopted or followed a similar approach in defining "unlawful assembly," requiring violence or a threat of violence as part of the gravamen of the offense. See, e.g., *State* v. *Elliston*, 159 N.W. 2d 503, 505-508 (Iowa 1968) (statute defining unlawful assembly as "[w]hen three or more persons in a violent or tumultuous manner assemble together to do an unlawful act, or, when together, attempt to do an act, whether lawful or unlawful, in an unlawful, violent, or tumultuous manner, to the disturbance of others . . ."); *Koss* v. *State*, 217 Wis. 325, 326-330 (1935) (statute providing, "Any three or more persons who . . . being together, . . . make any attempt or motion towards doing a lawful or unlawful act in a violent, unlawful or tumultuous manner to the terror or disturbance of others, shall be deemed an unlawful assembly . . .").

As Massachusetts cases cited *supra*, as well as Black's Law Dictionary 124 (8th ed. 2004) point out, it is not a necessary element of "unlawful assembly" that the object sought to be accomplished be unlawful. "In order that the assembly may be 'unlawful,' it is not necessary that the object of the meeting should itself be illegal. The test is, not the illegality of the purpose for which

"the intent to commit an act of violence." See *Commonwealth v. Frishman,* 235 Mass. at 451, 455.

This construction avoids any question of constitutional infirmity; only peaceful assemblies, not violent gatherings, are protected by the First Amendment and art. 19. See *Edwards* v. *South Carolina,* 372 U.S. at 234-236; *Cox* v. *Louisiana,* 379 U.S. at 544-552.[8] In this way, we satisfy our responsibility, described above, to impose a constitutional reading on § 2 if possible.

Because we conclude that the statute is constitutional, and because no transcript of the trial was submitted on appeal and we do not know on what basis the defendant was convicted, the judgment must be affirmed.

*Judgment affirmed.*

BROWN, J. (concurring in result). I agree that the defendant's appeal, at least in its current posture, must fail. The defendant

the persons are met, but the danger to the peace which their meeting involves. The mere fact . . . that the purpose is unlawful is not enough. . . . Thus, if a number of persons meet to plan a fraud, they may be guilty of a conspiracy, but their meeting is not an unlawful assembly." Black's Law Dictionary 124, quoting from 4 Stephen's Commentaries on the Laws of England 135-136 (L. C. Warmington ed. 1950).

[8] To the extent that cases concerning unlawful assembly can be read as requiring only a fear that participants will engage in riotous or violent conduct, decisions from the United States Supreme Court as well as the Supreme Judicial Court indicate that, in order to meet constitutional standards protecting the right to peaceably assemble and freedom of speech, some *actually threatening conduct or an actual act or acts of violence or riotous behavior* must be shown to support the dispersal order and a conviction under the statute; in other words, subjective fear on the part of witnesses or police officers is not enough, nor is loudness enough. See *Edwards* v. *South Carolina, supra; Cox* v. *Louisiana, supra.* Cf. *Commonwealth* v. *A Juvenile,* 368 Mass. at 596-597, 599.

Whether, in any particular case, an assembly was on the verge of rioting or violence or had formed a common intent to engage in violence at the time § 2 was invoked by police potentially may raise a difficult question of fact for the jury. While it is necessary to afford police some latitude in determining whether the requisite predicates for application of § 2 are present, police discretion cannot be construed so broadly as to undercut the right of peaceable assembly. Thus, in cases where inchoate violence forms the basis for an alleged violation of § 2, the jury charge must emphasize the necessity of a finding of a reasonable belief on the part of police based on specific conduct and actions of the assembly that a common intent to commit violence had been

chanced much by presenting only a facial challenge.[1] See *Commonwealth* v. *Lammi*, 386 Mass. 299, 301-302 (1982) (court will not pass on validity of "hypothetical applications" of a law subject only to facial challenge). Where a constitutional construction of a challenged statute is possible, a facial challenge must be rejected. *Blixt* v. *Blixt*, 437 Mass. 649, 652 (2002), cert. denied, 537 U.S. 1189 (2003).

The defendant's entitlement to reversal here hinged on a finding that G. L. c. 269, § 2, was susceptible of no fair reading that struck within constitutional limits. As set out in the foregoing opinion, it is not only possible, but required for us to impose a constitutional construction on § 2, foreclosing any opportunity for relief on the basis of a facial challenge. If the defendant believes that § 2, *as applied* to his particular situation, presents a constitutional violation, he may advance that claim by way of a motion for a new trial in the District Court. In the meantime, the judgment must stand.

The majority opinion concludes that "unlawful assembly,"

---

formed and that violence was imminent. Mere speculation on the part of police will not suffice to sustain a conviction. Where such factual questions are present, an instruction describing the legal standards to be applied, including reference to relevant constitutional protections, should be provided. See, e.g., *Tatro* v. *Kervin*, 41 F.3d 9, 16-17 (1st Cir. 1994).

[1]Although choosing not to include a transcript on appeal because he was pressing a purely facial challenge to the statute, the defendant in his brief also purports to challenge the adequacy of the judge's jury instructions. In support of his claim, he has submitted what appear to be copies of pages from a set of model jury instructions that were provided to the jury for use during their deliberations. It is impossible to infer that these amount to a reliable record of the actual jury charge. Even were we to assume — which I cannot on the basis of the current record — that these were the instructions that the trial judge intended to give at trial, I could not be certain that the judge, in fact, so charged the jury. It is frequently the case that errors, omissions, or amplifications that depart from the judge's written text find their way into an oral charge. The parties' unsupported recollections of the judge's charge offered during oral argument do not eliminate concerns about the possibility of such unintended deviations (or about the content of the charge, in general). Further, and perhaps more important, it is generally impossible to assess the adequacy of jury instructions abstracted from the underlying facts. Where, for example, an issue is not contested by the parties, even a serious error relating to that issue may not provide a basis for relief. In any event, it was plainly the defendant's choice to proceed without a record here. Having made that choice, he cannot compel a court to reach issues that would require at least some degree of speculation about the contents of the record.

for the purposes of § 2, must be defined as "any gathering otherwise meeting the requirements of [G. L. c. 269, § 2], the members of which have formed a common intent to 'engage[] in a common cause . . . to be accomplished with violence' . . . , that is, where there is [evidence of acts providing probable cause to believe that there is] an 'imminent danger . . . [of] violence.' " See *ante* at 585. See also *ante* at 586 n.8. While I agree that the majority's view is indicated by prior Massachusetts decisions relating to the common law provenance of the term "unlawful assembly," I believe it is important to emphasize that placing such a limitation on § 2 is also mandated by the First Amendment to the United States Constitution and art. 19 of the Massachusetts Declaration of Rights.

Absent the sort of limiting construction imposed on it by the majority opinion, § 2 would constitute an omnibus restraint on the right of assembly, with essentially no objectively defined restrictions on the circumstances in which it could be enforced. As a result, it would confer virtually unlimited discretion on police in the exercise of the dispersal power under § 2, posing a strong possibility that the law would be used to prohibit constitutionally protected expressive conduct.[2] Such unlimited restraints on potentially protected forms of expression have been disapproved by both the United States Supreme Court and our own Supreme Judicial Court.[3]

In *Edwards* v. *South Carolina*, 372 U.S. 229, 233-238 (1963), the United States Supreme Court overturned convictions, of breach of the peace, of persons who had refused to obey an order to disperse from an assembly protesting discrimination,

---

[2]Statutes giving police broad power to arrest for speech or to order persons to disperse from assemblies also create the potential for unlawful selective enforcement. See *Grayned* v. *Rockford*, 408 U.S. 104, 108 (1972) ("laws must provide explicit standards for those who apply them"); *Houston* v. *Hill*, 482 U.S. 451, 465 (1987) ("we have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them")

[3]By contrast, statutes placing restraints on assembly that are limited to a particular time, place, or manner have been approved in a wide variety of contexts. See, e.g., *Cox* v. *Louisiana*, 379 U.S. 559, 568-589 (1965) (ordinance prohibiting picketing near court house that disrupts normal operations of court house deemed sufficiently narrowly drawn to meet demands of First Amendment).

under a South Carolina statute that permitted arrest not only for acts of violence but also for acts that were "unjustifiable and unlawful, tending with sufficient directness to break the peace." *Id.* at 234. The statute, thus, like G. L. c. 269, § 2, did not contain express limitations on the circumstances in which it could be enforced. The Court observed that such general restraints on the right of assembly pose serious First Amendment concerns. *Id.* at 237-238. In order to meet constitutional requirements, the *Edwards* court held, persons may not be prevented from exercising their right of assembly absent a showing of "a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest." *Id.* at 237. Vague menace to public "tranquility" will not suffice to displace core constitutional protections. *Id.* at 234-238. In the absence of any evidence of "violence or threat of violence" among members of the assembly at issue in *Edwards*, the Court concluded that the right of assembly had been unconstitutionally impaired by the South Carolina law. *Id.* at 236-238.

Similarly, in *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 587-599 (1975), the Supreme Judicial Court held that G. L. c. 272, § 53, which generally proscribes "disorderly conduct," was unconstitutional as applied to speech and expressive conduct absent some form of limiting construction. As the court stated there, to the extent that § 53, drafted as it was without any objective restrictions on how, when, or where it could be enforced, is " 'susceptible of application to protected expression,' it is unconstitutionally overbroad." *Id.* at 586, quoting from *Gooding* v. *Wilson*, 405 U.S. 518, 523 (1974). Along the same lines, in *Commonwealth* v. *Jarrett*, 359 Mass. 491, 497-498 (1971), the Supreme Judicial Court concluded that the crime of disturbing the peace, also potentially an omnibus restraint on protected forms of expression, is constitutional because it does not apply to conduct protected by the First Amendment and art. 19. See *Commonwealth* v. *Welch*, 444 Mass. 80, 99-100 (2005) (G. L. c. 265, § 43A, the criminal harassment statute, cannot be applied to speech protected by First Amendment).

By limiting application of § 2 to those situations in which,

by dint of a common intent so to do, an assembly either resorts to violence or engages in acts[4] supporting probable cause to believe that violence by the group is imminent, the majority opinion has ensured that no constitutional infraction of the sort identified in these above mentioned cases will occur. See *Boos* v. *Barry*, 485 U.S. 312, 330-331 (1988) ("where demonstrations turn violent, they lose their protected quality as expression under the First Amendment"). While there were surely other potential routes to this outcome — e.g., imposition of a savings clause — the majority's approach has the support of common law precedent and also comports with relevant principles of appellate restraint. It is, for these reasons, the outcome I endorse.[5]

One last point: I would like to express my strong belief that the parties, in particular the Commonwealth, were seriously remiss in failing to provide us with a complete record of the

---

[4]The reference to "acts," *ante* at 586 n.8, as the requisite basis for a finding of probable cause to believe that a gathering has formed a collective intent to engage in imminent violence is an important part of the majority's formulation of the elements of the offense described in § 2. Absent such a requirement, police would be afforded too much discretion in enforcing that provision. It is only when an assembly either engages in actual violence or commits overt acts that make it plain that such violence by the group is imminent that police may issue a valid dispersal order, at least under § 2.

[5]It is important to note that the reading the majority imposes on G. L. c. 269, § 2, by no means trenches on police authority to control crowds or protect public safety. The law provides ample alternative mechanisms for accomplishing these ends. In the first instance, police retain general authority to make arrests whenever they have probable cause to believe a crime is being committed. Towns and cities may impose permissible "time, place, and manner" restrictions on public gatherings as a matter of local law. See, e.g., *Cox* v. *New Hampshire*, 312 U.S. 569, 576 (1941). Anyone violating such ordinances, including valid permit requirements, would be subject to arrest under local laws or ordinances without reference to G. L. c. 269, § 2. Further, within the scope of their community caretaker function, and under the general power of arrest conferred on police by G. L. c. 41, § 98, police have authority to take any reasonable protective measures whenever public safety is threatened by dangerous acts, not expressly unlawful. See, e.g., *Commonwealth* v. *Bates*, 28 Mass. App. Ct. 217, 219 & n.2 (1990) (emergency or "community caretaker" exception authorizes police to make otherwise unlawful entries or searches "to protect or preserve life or avoid serious injury"). Finally, police have the power to arrest individuals participating in lawful assemblies who are engaged in unrelated criminal acts, or who stand ready to assist others engaged in such acts. In short, nothing in the majority's decision strips police of their broad authority to preserve the peace and ensure public safety.

proceedings below. While the Commonwealth might have perceived a tactical advantage in following the defendant's lead in this regard, the prosecutor would have done well to remember his larger role as a purveyor of justice, not merely an advocate for affirmance. If it is clear that a case cannot receive adequate review absent the trial record, I would hope that the government, in future cases, will do its best to ensure that we receive a copy of the complete record. In view of our disposition of this matter, it is all but certain that this case will now require collateral review. Such inefficiency is both unnecessary and undesirable.

BERRY, J. (dissenting). I respectfully dissent for the following reasons.

First, I dissent because the newly formulated definition of an unlawful assembly proposed in the majority opinion and endorsed in the concurrence is not tenable as a matter of statutory construction, wholly departing as it does from the statutory terms appearing in G. L. c. 269, §§ 1 and 2. Moreover, the new formulation intermixes the two different crimes of riot and unlawful assembly set forth in these laws. See part I, *infra.*

Second, I dissent because the majority formulation (also accepted by the concurrence) would lead to unconstitutional overbreadth and vagueness in law enforcement in the constitutionally protected sphere of free assembly. The majority formulation, I believe, lacks constitutionally requisite narrow and precisely drawn objective law enforcement criteria and standards and does not remove the "threat" to the right of free assembly.

While "the text of the relevant statute, read literally, [on its face may be] void for vagueness both on notice and on discretionary enforcement grounds," a "narrowing construction [may] alleviate[ ] both of these difficulties." *Chicago* v. *Morales,* 527 U.S. 41, 61 n.31 (1999). A court's "power to determine the meaning of a statute carries with it the power to prescribe its extent and limitations as well as the method by which they shall be determined." *Smiley* v. *Kansas,* 196 U.S. 447, 455 (1905). But, in order to obviate void for vagueness problems, the narrowing construction must itself meet constitutional measure. In

this case, any narrowing construction of the unlawful assembly statutes in G. L. c. 269, §§ 1, 2, must meet "the more important aspect of the vagueness doctrine . . . [and a] principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender* v. *Lawson*, 461 U.S. 352, 358 (1983), quoting from *Smith* v. *Goguen*, 415 U.S. 566, 574 (1974). In my opinion, the majority formulation does not do this. Rather, the majority formulation of what would be an unlawful assembly, subject to arrest and prosecution, rests not on objectively discernible fact-based criteria and standards, yielding minimal guidelines for law enforcement, but on theoretically presumed, common states of mind and common intents, which common states of mind are to be subjectively ascribed by law enforcement to ten or more assemblers, and which may subjectively seem to an arresting officer as portending "inchoate violence" (see *ante* at 586 n.8) — all this, even though nothing objectively criminal or violent has happened in the assembly. This lack of precision and lack of objective law enforcement criteria and standards would, I submit, sanction the arrest and prosecution of citizens gathered in an assembly in an unconstitutionally "standardless sweep [that] allows policemen, prosecutors, and juries to pursue their [own] personal predilections." *Commonwealth* v. *Williams*, 395 Mass. 302, 304 (1985), quoting from *Smith* v. *Goguen*, 415 U.S. at 575. This is the very harm that the void for vagueness doctrine is designed as a constitutional bulwark against. See part II, *infra*.

"[I]mprecise laws can be attacked *on their face* under two different doctrines. First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.' *Broadrick* v. *Oklahoma*, 413 U.S. 601, 612-615 (1973). Second, even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests. *Kolender* v. *Lawson*, 461 U.S. 352, 358 (1983)." (Emphasis supplied). *Chicago* v.

*Morales*, 527 U.S. at 52. Where a facial constitutional challenge to a statute is posed because of overbreadth or void-for-vagueness, there is in the First Amendment area a "departure from traditional rules of standing . . . . [so] *that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression*" (emphasis supplied). *Broadrick* v. *Oklahoma*, 413 U.S. at 613.[1]

Third, I dissent because the majority affirms the defendant's conviction (as would the concurrence), notwithstanding the defendant's objection to a jury instruction, which jury instruction it is acknowledged by all opinions herein is completely different from the new formulation and, as delivered in the defendant's trial, was based on a facially unconstitutional reading of the unlawful assembly statute — a reading of the statute to which the defendant had raised a constitutional challenge at the onset of the criminal prosecution.[2] See part III, *infra*.

Finally, in part IV, *infra*, in contrast to the majority's defini-

---

[1]In the First Amendment area of expression and assembly, "attacks on overly broad statutes [may be leveled] with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Dombrowski* v. *Pfister*, 380 U.S. 479, 486 (1965). "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick* v. *Oklahoma*, 413 U.S. at 612.

Based on the foregoing principles of constitutional adjudication, I depart from the conclusion in the concurrence, *ante* at 586-587, that "[t]he defendant chanced much by presenting only a facial challenge . . . [because a] court will not pass on [the] validity of 'hypothetical applications' of a law subject to only [a] facial challenge . . . [and] [w]here a constitutional construction of a challenged statute is possible, a facial challenge must be rejected." First, this case does not present a " '*hypothetical* application[ ]' of a law." The defendant was *really* convicted under an unconstitutional construction of the law. Second, it is not so that, where a different constitutional construction is possible from that which governed a prosecution, a facial challenge is pretermitted. If that were so, a facial challenge to an unconstitutional statute would always be doomed by a potential construction brooding out in the omnipresent, but not existing in statute or case law, and not incorporated in the legal instructions governing a trial.

[2]I reject the suggestion in the concurrence that the defendant's facial constitutional challenge and related objection to the jury instruction — which

tion, I state an alternative formulation of the offense of unlaw-
ful assembly, which is drawn from within the terms of G. L.
c. 269, §§ 1, 2, but which is narrowed and based on objective
law enforcement standards so as to meet constitutional measure.

## I

On the statutory front, I dissent because the majority's
redefinition of the crime of unlawful assembly is a rewriting
that is without source in the precise statutory language set forth
in G. L. c. 269, § 2, and the relating counterpart, G. L. c. 269,
§ 1. In a process of importation of the elements of riot into the
offense of unlawful assembly, parts of the language in G. L.
c. 269, §§ 1, 2, are rendered mere surplusage. Indeed, rather
than turning to the terms setting forth the offense of unlawful
assembly appearing in these two sections, the majority opinion
crafts a new unlawful assembly crime by incorporating the ele-
ments from the crime of riot. This is achieved through quota-
tions taken from cases involving riots, *not* unlawful assemblies,
e.g., *Commonwealth* v. *Runnels*, 10 Mass. 518, 519 (1813);
*Commonwealth* v. *Gibney*, 84 Mass. 150, 152 (1861); *Com-
monwealth* v. *Frishman*, 235 Mass. 449 (1920); and *Ela* v. *Smith*,
71 Mass. 121, 135 (1855).[3] The end result is that the majority

---

instruction incorporated the constitutionally challenged reading of the unlaw-
ful assembly law — are not before this court, and that the defendant's convic-
tion may be sustained because of a failure to preserve appellate rights. To the
contrary, as explained in notes 1, *supra*, and 16, 17, and 21, *infra*, of the dis-
sent, the defendant preserved both a facial constitutional challenge to the
statute and a jury instruction challenge for appellate review. The emphasis on
this procedural point relating to the preservation of appellate rights is the only
real difference between the majority and the concurrence.

[3] In *Commonwealth* v. *Frishman*, 235 Mass. 449 (1920), a riot case, not an
unlawful assembly case, the question presented was whether participants in an
unlawfully constituted parade (the parade was conducted without the neces-
sary permits and was thus unlawful, *id.* at 453, 454) were properly convicted
of riot, when a stabbing took place during the course of the parade. The
majority's citation to, and quotation from, *Frishman* suggesting that the case
supports that an "essential element" of unlawful assembly is "the intent to
commit an act of violence" is simply incorrect. *Ante* at 585-586. In the cited
passage, the reporter's notes — not the opinion of the court — state that for
the separate crime of riot, "the essential element was that there must be the
violence *and* the intent to commit an act of violence" (emphasis supplied).
*Id.* at 451. Similarly, *Commonwealth* v. *Runnels*, 10 Mass. 518, 519-520 (1813),

redefines what would be an unlawful assembly by riot-related elements. According to the majority, *ante* at 585-586,

> "an 'essential element' of both 'riot' and 'unlawful assembly' is 'the intent to commit an act of violence.' See *Commonwealth* v. *Frishman,* 235 Mass. at 451, 455."

The majority, thus,

> "conclude[s] that the term 'unlawful assembly' should be defined, for the purposes of G. L. c. 265, § 2, as any gathering otherwise meeting the requirements of that provision, the members of which have formed a common intent to 'engage[ ] in a common cause . . . *to be accomplished*[4] with violence and in a tumultuous manner' (*Commonwealth* v. *Gibney,* 84 Mass. at 152) or 'through force and violence' (*Commonwealth* v. *Frishman,* 235 Mass. at 352, 355), that is, where there is an 'imminent danger . . . [of] violence.' *Ela* v. *Smith,* 5 Gray at 135." (Emphasis supplied.)

*Ante* at 585. This reconstruction, incorrectly I believe, merges the different crime of common-law riot with that of unlawful assembly[5] — even though it is clear from G. L. c. 269, § 2, and

---

was a riot case, not an unlawful assembly case. The question in *Runnels* was whether an indictment was proper where not every act in the indictment was separately alleged to have been done "with force and arms" and where the indictment did not specifically allege that the acts had been done "to the terror of the people." *Id.* at 519. Finally, *Ela* v. *Smith,* 5 Gray 121, 135 (1855), was a case involving a threatened riot, not an unlawful assembly case either. In *Ela,* the court considered the construction of statutes "by which authority is given to certain civil officers to call out the organized militia of the Commonwealth to aid in preserving the public peace and enforcing the laws." *Id.* at 134. That is, the court is concerned with whether the statutory prerequisite for the mayor's calling of the militia, that a "tumult, riot or mob shall be threatened," was present in this case. *Id.* at 135. At no point in the *Ela* opinion does the court seek to identify what might constitute an unlawful assembly within the meaning of the statutory precursor to G. L. c. 269, §§ 1, 2.

[4]Note the futuristic "inchoate" nature of the majority's definition, including *ante* at 586 n.8 — a point further addressed below. See notes 10 and 11, *infra,* and accompanying text.

[5]General Laws c. 269, § 2, with reference back to § 1 (see part IV, *infra*), makes clear that there are two separate crimes —riot and unlawful assembly — and speaks in the disjunctive in defining these two separate criminal acts.

> "Whoever, being present and being so commanded to assist in arresting such *[1] rioters or [2] persons so unlawfully assembled,* or in suppress-

§ 1, that riot is a separate crime from unlawful assembly.[6] It is, I believe, a mistake to say that a riot and an unlawful assembly are synonymous. Indeed, this leads to an underinclusive effect on law enforcement because persons assembled, who stand together in violation of a criminal statute or ordinance, may not be engaged in a riot, but may nonetheless be engaged in an unlawful assembly. See the formulation *infra*, which includes violation of a criminal law or ordinance as constituting an unlawful assembly.

Thus, as a matter of statutory construction, I dissent from this formulation, which not only departs from the language of G. L. c. 269, §§ 1, 2, but also makes two different crimes — riot and unlawful assembly — into virtually the same crime.[7]

## II

On the constitutional front, the majority's reformulation is destructured from the archstone of free assembly guaranteed by art. 19 of the Massachusetts Declaration of Rights and the First Amendment to the United States Constitution (and addressed in precedent of the Supreme Judicial Court and the United States

---

ing such *[1] riot or [2] unlawful assembly*, refuses or neglects to obey such command, or, if required by such magistrate or officer to depart from the place, refuses or neglects so to do, shall be considered one of the *[1] rioters or [2] persons unlawfully assembled*, and shall be [subject to criminal prosecution and punishment]" (emphases supplied).

Indeed, the crimes of riot and unlawful assembly have been separate statutory crimes in the Commonwealth since the mid-eighteenth century, see, e.g., St. 1786, c. 38, §§ 1, 2.

[6]The Model Penal Code notes that "many jurisdictions" — listing Massachusetts among them, with citation to G. L. c. 269, § 2 — maintain riot and unlawful assembly as separate crimes. Model Penal Code § 250.1 commentary (1980).

[7]Apart from statutory construction overlap, there is another critical difference. The crime of riot is not entitled to constitutional protections under art. 19 of the Massachusetts Declaration of Rights or the First Amendment to the United States Constitution. A riot is an act of violence, not expressive conduct. In contrast, an assembly of citizens gathered to address public issues is protected by these constitutional guarantees. It may be that the majority's interweaving of the two crimes also accounts for certain vagaries in its constitutional analysis, as the majority begins to speak of "inchoate" crimes of violence and common intent to commit future acts of violence (see note 10, *infra*), in connection with its definition of unlawful assembly.

Supreme Court). Accordingly, I dissent as a matter of both State and Federal constitutional law.

Any analysis of the constitutional challenge that brought this case before the court on appeal from a conviction of unlawful assembly by a citizen under G. L. c. 269, § 2, must begin with the overarching principles of government in the Massachusetts and Federal Constitutions. "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States* v. *Cruik-shank*, 92 U.S. 542, 552 (1875). "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. . . . [T]he right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions . . . ." *De Jonge* v. *Oregon*, 299 U.S. 353, 364 (1937). "The right [of assembly] is indubitable. The importance to the public welfare of this constitutional guaranty has been recognized and scrupulously upheld by the courts." *Commonwealth* v. *Surridge*, 265 Mass. 425, 427 (1929). Our State courts have written that from as far back as the battle for independence in the late eighteenth century, "[i]t is hard to overestimate the historic significance and patriotic influence of the public meetings held in all the towns of Massachusetts . . . ." *Wheelock* v. *Lowell*, 196 Mass. 220, 227 (1907).[8]

I believe that the unconstitutional overbreadth and, even more pronouncedly, void for vagueness problems in the reading by the majority and concurrence lie in the lack of enunciation — with the great and heightened degree of specificity that is

---

[8]Given the history of the enactment of art. 19 and the First Amendment to preserve and protect the right of assembly, it does not escape comment that the assembly at which the defendant (along with twenty-three other persons) was arrested and which led to the defendant's conviction was held to protest the involvement of the United States in the Iraq war — an issue of intense national debate.

Further, that the defendant was acquitted on two other charges, disturbing the peace, G. L. c. 272, § 53, and obstructing a public passageway or sidewalk in violation of a municipal ordinance, casts some light on the nature of the assembly as not being disruptive. Indeed, the Commonwealth's brief concedes that the defendant "was not alleged to have been part of a 'tumultuous or riotous' assembly."

constitutionally required[9] — *of objective, fact-based law enforcement criteria and narrow, clear, and definite criminal law standards*, which would affirmatively guide enforcement actions by, and negatively limit the unfettered discretion of, police officers — who, after all, will be the enforcers of the unlawful assembly criminal law, as the issuers of dispersal commands, which are the initiating predicate to arrest and prosecution. Without objective law enforcement standards, there is an unconstitutional "entrust[ing of] lawmaking to the moment-to-moment judgment of the policeman on his beat." *Chicago* v. *Morales*, 527 U.S. at 60, quoting from *Kolender* v. *Lawson*, 461 U.S. 360. "A vague law impermissibly delegates basic policy matters to policemen, judges and juries . . . ." *Commonwealth* v. *Gallant*, 373 Mass. 577, 580 (1977), quoting from *Grayned* v. *Rockford* 408 U.S. 104, 108-109 (1972).

Instead of *objective criteria for law enforcement action* in this highly protected constitutional sphere of expression and assembly, there is a predominately *subjective state of mind focus* in the majority's definition of unlawful assembly. This wide swath and standardless domain within which arrests could be made and criminal prosecutions could be instituted brings with it the unacceptable risk of trenching upon protected rights of the people to assemble peacefully in a democratic society such as ours.

The formulation by the majority and concurrence would allow for arrests and prosecution if a government official somehow subjectively discerned "a common intent [shared among ten or more assemblers] to 'engage[] in a common cause . . . to be accomplished with violence.' " *Ante* at 585. This latter attribute is referred to at another point in the majority opinion

---

[9] "[A]ny statute which regulates speech [or the right to assemble as expressive conduct] requires the strictest of our scrutiny because 'the line between speech [and expression by assembly] unconditionally guaranteed and speech [and assembly] which may be legitimately regulated, suppressed, or punished is finely drawn.' " *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 584 (1975), quoting from *Speiser* v. *Randall*, 357 U.S. 513, 525 (1958). "Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith* v. *Goguen*, 415 U.S. at 573.

as "inchoate violence,"[10] *ante* at 586 n.8, something I have not known in the criminal law. In any event, the vagaries inherent in defining the crime of unlawful assembly, as the majority and concurrence would, by a nonobjectively measurable "common intent," and a nonobservable "common cause," which might supposedly be internally shared by more than ten persons assembled and which, an arresting officer subjectively thinks, may inchoately portend a future violent status that has not yet happened in the assembly, would stifle constitutionally protected expression, and would grant close to limitless and ad hoc discretion to government officials under criminal law to arrest and seize the participants of one assembly, but not to arrest and seize the participants of a different assembly.[11] Such police actions, as would be sanctioned by the subjective state of mind

---

[10]In addition to a "savings clause" suggested by the concurrence, *ante* at 590 n.4, and addressed below, it is suggested by the majority, *ante* at 586 n.8, that a jury instruction would also save, and somehow clarify, the vague definition endorsed in the opinions, including further instruction concerning what "inchoate violence" is. The proposed jury-based savings clause in the majority states:

> "Whether, in any particular case, an assembly was on the verge of rioting or violence or had formed a common intent to engage in violence at the time § 2 was invoked by police potentially *may raise a difficult question of fact for the jury. . . . Thus, in cases where inchoate violence forms the basis for an alleged violation of § 2, the jury charge must emphasize the necessity of a finding of a reasonable belief on the part of police based on specific facts and actions of the assembly that a common intent to commit violence had been formed and that violence was imminent."*

But a jury instruction delivered during a criminal prosecution — after arrests have ended an assembly — does not serve to save the original constitutionally protected right to assemble and express views in a public forum on the streets of the Commonwealth. This proposed jury-based savings clause (as the other savings clause proposed by the concurrence, *ante* at 590 n.4, and discussed *infra*) is too little, and comes too late, to save the flaws in the construction by the majority and the concurrence.

[11]In March, 1966, a United States Senate subcommittee hearing on migrant labor laws was convened in California, which directed an inquiry into the arrests of migrant grape pickers who were engaged in demonstrations and picketing. The following colloquy between Senator Robert F. Kennedy and a sheriff who had ordered arrests of the demonstrators is of interest.

> SHERIFF GALYEN: "Well, if I have reason to believe that there's going to be a riot started and somebody tells me that there's going to be trouble if you don't stop them, it's my duty to stop them."

vagaries in the majority's formulation (without objectively based law enforcement criteria and standards), present a substantial risk of content-laden abridgement in constitutionally protected forums of democratic assembly and have the danger of chilling the right of assembly in our democracy. It is important to note that, under the proposed majority formulation, arrests would be authorized, notwithstanding that the gathered assemblers have not done anything that is in violation of any law or ordinance and have not acted in a manner that objectively manifests riotous or tumultuous effects in the assembly (which are two objectively measurable elements which, I submit are required by G. L. c. 269, §§ 1, 2).

Given the vagaries in the formulation of the offense of unlawful assembly, the concurrence, *ante* at 590 n.4, would mine from hidden crevices in the majority opinion — crevices so hidden that I do not see them within the majority's holding —

SENATOR KENNEDY: "Then do you go out and arrest them?"

SHERIFF GALYEN: "Yes."

SENATOR KENNEDY: "And charge them?"

SHERIFF GALYEN: "Charge them."

SENATOR KENNEDY: "What do you charge them with?"

SHERIFF GALYEN: "Violation of unlawful assembly."

. . .

SENATOR KENNEDY: "Senator, could I finish my questioning here? This is the most interesting concept, I think, that you suddenly hear or you talk about the fact that somebody makes a report about somebody going to get out of order, perhaps violate the law, and you go and arrest them, and they haven't done anything wrong. How can you go arrest somebody if they haven't violated the law?"

SHERIFF GALYEN: "They're ready to violate the law."

. . .

SENATOR KENNEDY: "Can I suggest in the interim period of time, the luncheon period of time, that the sheriff and the district attorney read the Constitution of the United States?"

Amending Migratory Labor Laws: Hearings on S. 1864, S. 1866, S. 1867, and S. 1868 Before the Subcomm. on Migratory Labor of the Senate Comm. on Labor and Pub. Welfare, 89th Cong. 629-630 (March 16, 1966) (statement of Sheriff Galyen, Kern County, California).

what the concurrence chisels into a supplemental definitional "requirement" of *imminent violence/actual violence/probable cause for violence/and overt acts.*[12] Indeed, the concurrence acknowledges that, "[a]bsent such a requirement [as the concurrence would propose] police would be afforded too much discretion in enforcing that provision." (See *ibid.,* reproduced in the margin below.) Respectfully, I am perplexed as to the proposition in the concurrence that the majority construction of unlawful assembly under G. L. c. 269, §§ 1, 2, can only withstand constitutional scrutiny if read as incorporating elements suggested in a "savings clause" in the concurrence — a most unusual methodology for constitutional analysis. The concurrence, then, is not really concurring at all, but rather is engaged in secondary engrafting to shore up by a "concurring" bracing wall a perceived and acknowledged void for vagueness deficiency in the majority formulation.[13] See, e.g., *ibid.*

Equally problematic is that certain of the premises set forth in the concurrence (and its supplemental "requirement") flow from inaccurate descriptions of the issues presented, type of statutes involved, and the ultimate holdings of the United States

---

[12]Without extended discussion, I would simply note we are, most assuredly, not talking about either a conspiracy or a joint venture crime, as to which the existence of an overt act is an essential element. Hence, where guaranteed rights of the people to assemble are at issue, the vagaries inherent in references to common states of mind and a common intent shared by a group of citizens gathered together, such as proposed in the formulation of the majority and the concurrence, are not constitutionally "fixed" either by referencing one overt act by one assembler or by the carrying over of the overt act predicate for crimes that have nothing to do with rights of assembly.

[13]For ease of reference, I reproduce in full one such "engrafting" part of the concurrence, *ante* at 590 n.4, which states as follows.

> "The reference to "acts" . . . as the requisite basis for a finding of *probable cause* to believe that a gathering has formed a collective intent to engage in *imminent violence* is an important part of the majority's formulation of the elements of the offense described in § 2. Absent such a requirement, police would be afforded too much discretion in enforcing that provision. It is only when an assembly either engages in *actual violence* or commits *overt acts* that make it plain that such violence by the group is imminent that police may issue a valid dispersal order, at least under § 2." (Emphases supplied.)

Supreme Court in three decisions that are much cited in the concurrence (as well as in the majority). The three cases are *Cox* v. *Louisiana*, 379 U.S. 536 (1965) (*Cox I*); *Cox* v. *Louisiana*, 379 U.S. 559 (1965) (*Cox II*); and *Edwards* v. *South Carolina*, 372 U.S. 229 (1963) (*Edwards*).

*Cox I*, *Cox II*, and *Edwards* are cited, discussed and quoted from in the concurrence (and in the majority) as if these three constitutional precedents involved the criminal offense of unlawful assembly statutes. None of the cases did.[14] In *Cox I*, the Supreme Court considered the conviction of a civil rights leader under a breach of the peace statute. The Court held that the breach of the peace statute was unconstitutional on its face because the statute had been construed by the State court in such a vague manner that it potentially reached demonstrators

---

[14]In addition to repeated citations to, and quotations from, this trilogy of cases throughout the majority and concurrence, I note, in particular, that the reservations expressed in the concurrence, *ante* at 590 n.4, and the "savings" clause restructuring of the majority formulation proposed there, relate back to, and resonate from, one footnote in the majority opinion, *ante* at 586 n.8. That footnote, in turn, purports to rest on the holdings in *Cox I* and *Edwards*. Because, as further discussed herein, neither of these two cited Federal cases, nor the Massachusetts case, *Commonwealth* v. *A Juvenile*, 368 Mass. 580 (1975) (offense of disorderly conduct), involve unlawful assembly statutes, the implication in the majority opinion that limiting language in that footnote (and cross-referenced in the concurrence) comes from the cited precedents of the United States Supreme Court or our Supreme Judicial Court in connection with the construction of unlawful assembly and dispersal statutes is simply not supportable.

For ease of reference, I reproduce the pertinent part of the majority opinion, *ante* at 586 n.8, which states as follows:

"To the extent that cases concerning unlawful assembly can be read as requiring only a fear that participants will engage in riotous or violent conduct, decisions from the United States Supreme Court as well as the Supreme Court Judicial Court indicate that, in order to meet constitutional standards protecting the right to peaceably assemble and freedom of speech, some *actually threatening conduct or an actual act or acts of violence or riotous behavior* must be shown to support the dispersal order and a conviction under the statute; in other words, subjective fear on the part of witnesses or police officers is not enough, nor is loudness enough. See *Edwards* v. *South Carolina, supra; Cox* v. *Louisiana*, 379 U.S. at 547-548 (1965). Cf. *Commonwealth* v. *A Juvenile*, 368 Mass. at 596-597, 599." (Emphasis original.)

not engaged in an assembly that manifested riotous effects. Specifically, the Court held:

> "The statute at issue in this case, as authoritatively interpreted by the Louisiana Supreme Court, is unconstitutionally vague in its overly broad scope. . . . "[T]he conviction under this statute must be reversed as the statute is unconstitutional in that it sweeps within its broad scope activities that are constitutionally protected free speech and assembly. Maintenance of the opportunity for free political discussion [and assembly] is a basic tenet of our constitutional democracy. As Chief Justice Hughes stated in *Stromberg* v. *California*, 283 U.S. 359, 369 [1931]: 'A statute which upon its face, and as authoritatively construed, is so vague and indefinitie as to permit the punishment of the fair use of this opportunity is repugnant to the guaranty of liberty contained in the Fourteenth Amendment.' "

*Cox I*, 379 U.S. at 551-552. (Of interest, and in comparison to *Cox II*, to be noted is that, in the case before us, the Commonwealth concedes that the assembly was not tumultuous; furthermore, the defendant was acquitted of disorderly conduct and of obstructing a public passage. See note 8, *supra*.) In short, *Cox I* does not stand for the unlawful assembly analysis proposed in the majority and concurring opinions.

Similarly in error, *Cox II* is cited and described in the concurrence, *ante* at 588 n.3, as if it involved a statute restraining an assembly. *Cox II* is not that at all. More accurately described, *Cox II* involved a Louisiana law, which tracked a Federal statute, prohibiting picketing near a courthouse to obstruct or impede the administration of justice. In *Cox II*, the Supreme Court never referred to the law as an assembly restricting statute. Rather, contrary to the concurrence description, the Supreme Court described the statute as follows.

> "This [courthouse picketing] statute was passed by Louisiana in 1950 and was modeled after a bill pertaining to the federal judiciary, which Congress enacted later in 1950, 64 Stat. 1018, 18 U.S.C. § 1507 (1958 ed.). Since that time, Massachusetts and Pennsylvania have passed

similar statutes. Mass. Ann. Laws, c. 268, § 13A; Purdon's Pa. Stat. Ann., Tit. 18, § 4327. The federal statute resulted from the picketing of federal courthouses by partisans of the defendants during trials involving leaders of the Communist Party."

*Cox II*, 379 U.S. at 561. I fail to understand the alchemy by which the concurrence takes a courthouse picketing statute (similar to the courthouse picketing law which remains on the books in Massachusetts in G. L. c. 268, § 13A)[15] and transforms it into an assembly restraint statute.

The majority and the concurrence frequently cite *Edwards* as support for their construction of the Massachusetts unlawful assembly statute. But *Edwards* does not offer such support. To the contrary — and significantly — in *Edwards*, the Supreme Court held unconstitutional a breach of the peace statute, which had been construed by the Supreme Court of South Carolina in a manner close to that which the majority and concurrence would propose here. Specifically, the Supreme Court of South Carolina included in its construction of the offense the following language, part of which echoes the construction proposed in this case.

> "In general terms, a breach of the peace is a violation of public order, a disturbance of the public tranquility, *by any act or conduct inciting to violence . . . ,* it includes any violation of any law enacted to preserve peace and good order. *It may consist of an act of violence or an act likely to produce violence.* It is not necessary that the peace be actually broken to lay the foundation for a prosecution for this offense. If what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required. Nor is actual personal violence an essential element in the offense. . . ." (Emphases supplied.)

---

[15]The Supreme Court upheld the facial validity of the statute in *Cox II, supra* at 564, that prohibited picketing near a courthouse so as to obstruct or impede the administration of justice, but held there was a due process violation because government officials had granted permission for the defendant and the other demonstrators to stand across the street from the courthouse. *Id.* at 568-571.

*Edwards, supra* at 234.

Accepting this State court decision as "binding," the United States Supreme Court held in *Edwards* that "[t]he Fourteenth Amendment does not permit a State to make criminal the peaceful expression of unpopular views. . . . [T]he courts of South Carolina have defined a criminal offense so as to permit conviction of the petitioners if their speech 'stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of those grounds [set forth in the State court's construction] may not stand.' " *Edwards, supra* at 237-238, quoting from *Terminiello* v. *Chicago,* 337 U.S. 1, 5 (1949). Again, I emphasize that in this case, as in *Edwards,* there was no tumultuous conduct, no disorderly conduct and no obstruction of a public passage way. See note 8, *supra.*

With these constitutional cases placed in the appropriate context and for the reasons stated above, I believe the "savings clause" in the concurrence, *ante* at 590 n.4 — which seeks, in turn, to shore up the majority formulation — is fundamentally flawed and does not save the majority formulation from being unconstitutionally void for vagueness.

### III

Apart from these statutory and constitutional issues, I also dissent from the affirmance of the particular conviction on appeal in this case. Even if one were to accept (and I do not) that the proposed redefinition meets constitutional measure, that redefinition is worlds apart from, and bears no similarity to, the actual jury instruction given at trial, and upon which the defendant's conviction rested.[16]

I also disagree with the suggestion in the concurrence that the

---

[16]The jury instruction, upon which the defendant was convicted, simply quoted parts of G. L. c. 269, §§ 1, 2, and directed the jury that a guilty verdict was returnable so long as the Commonwealth proved (1) "[t]hat ten or more persons, whether armed or not, were unlawfully assembled in a city"; (2) "[t]hat a city police officer commanded the defendant to immediately and peaceably disperse"; and (3) "[t]hat the defendant refused or neglected to do so."

The above quoted open-ended jury instruction upon which the defendant was convicted mirrored the Commonwealth's proposed instruction. That is to

issue involving the jury instruction is not before us.[17] The defendant objected to the jury instruction as an unconstitutional reading of the statutory elements of proof, and the defendant argued that one of the elements necessary for conviction of the crime of unlawful assembly required that the Commonwealth must prove that the assembly was one that is riotous and tumultuous (this is consistent with what I believe is the proper construction of the term "unlawful assembly" in G. L. c. 269, §§ 1, 2, see discussion in part IV, *infra*). Given the foregoing, I fail to see how the defendant's convictions can be affirmed — as both the majority and concurrence would do.

On this point, because the unconstitutional definition of unlawful assembly in the jury instruction was not narrowly circumscribed by the offense elements I address in part IV, *infra*, I believe that reversal is warranted, even under the narrower reading which I would propose lies within the interstices of G. L. c. 269, §§ 1, 2 — a construction to which I now turn.

IV

In contrast to the formulation advanced by the majority and

say, at the District Court trial, and in the appeal to this court, the Commonwealth advanced a reading that a conviction under G. L. c. 269, § 2, is sustainable merely on proof that the persons assembled "are engaging in acts the officers know to be unlawful." Such a reading leaves wholly undefined the sources for such deemed knowledge, and does not link this "presumed" knowledge of a police officer (who decides solely in his or her discretion to arrest a person engaged in an assembly) either to any objective criteria (i.e., the turbulent and riotous nature of the assembly) or to a defined body of criminal offense prohibitions (the general laws or local ordinances).

[17] I disagree with the concurrence that there is some flaw in the defendant's compilation of the record appendix before this court, which includes the jury instructions. The docket shows that the instructions given to the jury were provided by the clerk to the defendant for compilation of the appendix. At oral argument there was no dispute by the Commonwealth, or the defendant, that these were the written instructions given to the deliberating jury.

The concurrence, *ante* at 587 n.1, would ignore the written jury instructions on the basis that the written copy may not have been "the instructions that the trial judge intended to give at trial . . . [because] [i]t is frequently the case that errors, omissions, or amplifications that depart from the judge's written text find their way into an oral charge." This proposition is incorrect. Even if the judge might have delivered oral jury instructions that were not in haec verba with the written instruction, the written instructions *are* jury instructions. To state the obvious, if there is error in the written jury instructions, there is error. And there was error. See note 16, *supra*, which quotes the jury instruction.

concurrence, I believe that the definitional elements of the crime of unlawful assembly fit more tightly within the extant black letter terms of G. L. c. 269, §§ 1, 2. Consistent with the terms in these two sections, I believe the crime of unlawful assembly has the following elements: (1) there was an assembly of ten or more persons; (2) in the place of a city or town; (3) the assembly was unlawful by virtue of being held in violation of criminal law or ordinance,[18] or the assembly was unlawful by virtue of objectively observable tumultuous or riotous effects[19]; (4) a police command was given to disperse; and (5) the defendant, having received the command, failed to disperse.

This formulation has *objective, fact-based law enforcement criteria and standards* against which a police officer may objectively determine whether there are legally sustainable grounds for a dispersal order, which if not followed would lead to arrest and prosecution. Further, with respect to legal and constitutional standards, tying, as I would, the offense elements to a violation of any criminal law or ordinance — or to objectively observable riotous or tumultuous effects — would render the statute "sufficiently narrowly and precisely drawn to

[18]The violation of a criminal law or ordinance may, separate from any violation of the unlawful assembly statute, give rise to probable cause for an arrest, based on the particular law or ordinance violated.

[19]It does not escape my attention that the definition I propose includes the terms *"riotous* effects." This, notwithstanding that, for the reasons already stated, I think the majority is incorrect in incorporating the elements of *riot* into the definition of unlawful assembly. But, there are differences between the terms *riot* and *riotous.* Conduct involving the more serious crime of riot differs from conduct involved in an unlawful assembly that objectively has riotous or tumultuous effects and characteristics. According to 8 Oxford English Dictionary 699 (1978), a "riot" is "[a] violent disturbance of the peace by an assembly or body of persons; an outbreak of active lawlessness or disorder among the populace; a hostile attack or encounter," manifesting "[v]iolence, strife, disorder, tumult, especially on the part of the populace." According to this dictionary's definitions, a thing that is "riotous" is of a lesser nature, defined as "noisy, tumultuous, unrestrained." *Id.* at 700.

Turning from the dictionary to the Model Penal Code, the Code also describes unlawful assembly as the less serious common-law offense and riot as the greater offense, as follows: "Common-law riot was one of a series of related offenses against the public peace. The least serious crime in this sequence was unlawful assembly . . . . Riot occurred where the persons assembled actually committed an unlawful act of violence or performed a lawful act in a violent and tumultuous manner. . . ." Model Penal Code § 250.1 commentary (1980).

ensure that it reach only [conduct] which the State has a justifiable and compelling interest in regulating." *Commonwealth* v. *A Juvenile*, 368 Mass. at 587 (authority to arrest "disorderly persons" does not extend to protected "expressive conduct"). See *Commonwealth* v. *Welch*, 444 Mass. 80, 99-100 (2005) (criminal harassment statute cannot be applied to otherwise qualifying acts that fall within protection of First Amendment).

This statement of definitional elements for unlawful assembly also honors the interrelated sections of G. L. c. 269, as enacted by the Legislature. As was noted by the Supreme Judicial Court in *Commonwealth* v. *Spearin*, 446 Mass. 599, 605 (2006), in G. L. c. 269, "[§ ] 1 . . . must be read in conjunction with § 2," as well as with the other sections contained in c. 269. Indeed, from the text of these sections themselves it is clear that the Legislature intended G. L. c. 269, § 2, to be read in conjunction with G. L. c. 269, § 1.[20] The interweaving of §§ 1 and 2 is evident in that the "whoever" (as an assembler in § 2, refuses to depart upon police command, and is subject to criminal prosecution) has as its antecedent that the "whoever" be one of the more than ten persons in § 1 *who "are unlawfully, riotously or tumultuously assembled."* If § 2 is not so construed in synthesis with its § 1 antecedent to mean that the § 2 putative "whoever" violator is one who under § 1 is "unlawfully, riotously or tumultuously assembled," then the criminal offense elements in § 2 turn in on themselves in a redundancy, viz., a criminal unlawful assembly is a criminal unlawful assembly.

---

[20]The Supreme Judicial Court in *Commonwealth* v. *Spearin, supra* at 603-606, determined that an inmate of a house of correction could not be convicted as a joint venturer of destruction of a building while unlawfully assembled, G. L. c. 269, § 7, because G. L. c. 269, §§ 1 and 7, did not apply to conduct occurring in a correctional facility, but only to conduct occurring in a city or town. In reaching this determination, the court defined the G. L. c. 269, § 7, criminal offense by looking to § 1 (as I would). The court reasoned that "[u]nder G. L. c. 269, §§ 1 and 7, persons engaged *in an unlawful, riotous, or tumultuous assembly*, who destroy or damage property, are subject to criminal penalties and tort liability." *Id.* at 604. This conjunctive reading of § 1 and § 7 in *Spearin*, in which § 7 has as its antecedent the § 1 terms, would, I submit, also apply to § 2. It would mean, as I propose, that a § 2 criminal offense of failure to follow a dispersal command has its antecedent in § 1, i.e., that the dispersal command issue in connection with an "unlawful[ ], riotous[ ], or tumultuous[ ] assembl[y]" as set forth in § 1.

This runs counter to the canon that "effect is given to both the specific and general words [of a statute] by treating the specific words as indicating a class" within the broader group defined by the general words. *Commonwealth* v. *Krasner*, 358 Mass. 727, 733 (1971) (Spalding, J., dissenting).

## V

The defendant preserved a constitutional facial challenge to G. L. c. 269, § 2, and § 1. The facially unconstitutional reading of these laws (which the defendant had challenged) was incorporated in instructions provided to the jury. In addition to preserving appellate rights by leveling the facial constitutional challenge,[21] the defendant also objected to those jury instructions. For these reasons, I dissent from the affirmance of the judgment and would instead reverse the conviction. See *Commonwealth* v. *A Juvenile*, 368 Mass. at 584-585. In addition, I dissent from the broadly brushed redefinition of the crime of unlawful assembly set forth in the majority opinion and in the concurrence. I believe the crime of unlawful assembly under G. L. c. 269, §§ 1, 2, follows the offense elements set forth in part IV of this dissent.

---

[21]As the majority notes, the defendant's appeal from his conviction is based exclusively on a direct constitutional challenge to G. L. c. 269, § 2. See *Commonwealth* v. *LaBella*, 364 Mass. 550, 553 (1974). The defendant perfected this appeal challenging the constitutionality of G. L. c. 269, § 2, on its face by advancing the issue in a pretrial motion to dismiss the complaints (see Mass. R.Crim.P. 13[c], 442 Mass. 1517 [2004]; *Commonwealth* v. *Chou*, 433 Mass. 229, 238 [2001]), and by objecting to the jury instruction — again challenging the constitutionality of the statute, as defined in that instruction.